## In re UNION DREDGING CO.

(District Court, D. Delaware.   March 19, 1915.)

No. 254.

1. BANKRUPTCY ⬤⇒272—COSTS AND FEES—CLAIM FOR SERVICES.

A claim of one employed by the executive committee of a company, three weeks before it filed its petition in bankruptcy, to go to California on behalf of the company and investigate its operations there, with power to take charge of them, and who, after the petition was filed and receivers were appointed of all the bankrupt's assets, was instructed by the directors to continue his investigations and report, irrespective of the receivership proceedings, and who reported to the directors, was properly disallowed by the referee as a claim for compensation for services rendered in the administration of the bankrupt estate.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 572, 573; Dec. Dig. ⬤⇒272.]

2. BANKRUPTCY ⬤⇒482—COSTS AND FEES—ATTORNEY FOR BANKRUPT.

Under Bankr. Act July 1, 1898, c. 541, § 60d, 30 Stat. 562 (Comp. St. 1913, § 9644), providing that if a debtor, in contemplation of the filing of a petition by or against it, pay money to an attorney for services to be rendered, the transaction shall be re-examined by the court, and held valid only to the extent of a reasonable amount, and that any excess may be recovered by the trustee, the petition for a re-examination is a condition precedent.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 874–876, 897; Dec. Dig. ⬤⇒482.]

3. BANKRUPTCY ⬤⇒482—COSTS AND FEES—ATTORNEY FOR TRUSTEE.

Under Bankr. Act, § 62, providing that expenses incurred by officers in the administration of estates shall be reported in detail and examined by the court, an allowance should not be made to a trustee in bankruptcy for an attorney employed for services for the estate not requiring professional skill, but within the ability of one of ordinary business capacity; but a proper compensation may be allowed for necessary legal services to a trustee, and where the trustee of a gold dredging company received $63,000, an attorney's claim of $1,500 for successfully overcoming special difficulties in the administration relating to insurance was properly allowed, and an allowance for traveling expenses should be increased to the amount expended, but the claim of another attorney, whose only difficult service related to the issuance of trustee's certificates, and whose other services related to ordinary matters of insurance, taxes, rents, water supply, etc., was properly reduced from $4,000 to $2,575, but his allowance for traveling expenses increased.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 874–876, 897; Dec. Dig. ⬤⇒482.]

In Bankruptcy.   Petition, in the matter of the Union Dredging Company, bankrupt, for review of orders of the referee disallowing claims for compensation for services rendered in the course of the administration of the bankrupt estate.   Modified.

Ward, Gray & Neary, of Wilmington, Del., for Wilmington Trust Co., Trustee, Sylvester D. Townsend, Jr., and Pillsbury, Madison & Sutro.

Hugh M. Morris, of Wilmington, Del., for Richard H. Vail.

Philip S. Hill, of New York City, for Griggs, Baldwin & Baldwin.

John Biggs and Armon D. Chaytor, both of Wilmington, Del., for creditors.

⬤⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

BRADFORD, District Judge. This case is before the court on petitions of review of certain orders made by the referee disallowing in whole or in part claims for compensation for alleged services rendered in the course of the administration of the bankrupt estate. It appears from the summary of evidence certified by him to the judge, among other things, that prior to the adjudication in bankruptcy April 10, 1913, the Union Dredging Company was engaged in gold dredging in California; that its plant and property situated in Sacramento County about two miles from Folsom and twenty two miles from Sacramento, consisted of six hundred and seventy two acres of land, approximately, with an office building and appurtenances thereon, and also a placer dredge, with its equipment and Keystone drill, mining tools and implements, and office furniture, books and supplies; that the placer dredge had been purchased under a contract of conditional sale, from the Bucyrus Company, of Milwaukee, Wisconsin, which provided that the title to the dredge was to remain in the vendor until the full purchase price and any and all notes given therefor or renewals thereof should be paid; that as an additional security for the payment of such purchase price a mortgage was given to the Bucyrus Company, covering practically all of the real estate of the bankrupt; that at the time of the filing of the petition in bankruptcy title to the dredge had not been acquired by the bankrupt, there then being owing of the purchase price thereof upwards of $16,000; that from April 12, 1913, until June 12 next following the said plant and property were in charge of Charles J. Cull and Wilmington Trust Company as receivers; that the latter was appointed trustee and as such took charge of the bankrupt estate June 12, 1913; that the real estate and personal property of the bankrupt were sold April 28, 1914, for $60,000; that the sale was confirmed May 28, 1914; that the receivers filed their account together with a petition for their discharge June 25, 1914, and a supplemental report November 23, 1914; that the first and final account of the trustee was also filed at the last mentioned date; that the total amount received by the trustee from all sources applicable to the costs and expenses of administration and to the claims of creditors, not taking into consideration the sum of $16,500, proceeds of trustee's certificates, issued and sold under order of court, and the further sum of $600, loaned for insurance on dredge, was the sum of $63,062.99; that the last mentioned sum includes $1,007.12, being the net balance, paid to the trustee, of the sum of $1,958.72, which came into the possession of the receivers; that of the above mentioned sum of $63,062.99 received by the trustee, $32,063.31 has been applied by it to the costs and expenses of administration, leaving a balance of $31,019.68 in the hands of the trustee applicable to further costs and expenses of administration and the claims of creditors. This balance should, in the opinion of the referee, be increased by the sum of $369.92, hereinafter particularly referred to, which has been directed to be turned over to the trustee by those to whom it was paid.

The matters in controversy covered by the petitions for review are: First, the disallowance of an alleged claim of Richard H. Vail, amounting to $943.25, representing an unpaid balance of moneys due

him for services and expenses rendered and incurred by him on account of the bankrupt estate. Second, the allowance to Griggs, Baldwin & Baldwin of the sum of only $130.08 as a set-off against the sum of $500 paid by the bankrupt to them before bankruptcy, and directing that law firm to turn over to the trustee the difference, namely, $369.92. Third, the disallowance of compensation claimed by Griggs, Baldwin & Baldwin to be due them as attorneys for Charles J. Cull, one of the receivers. Fourth, the allowance to the trustee for Pillsbury, Madison & Sutro of the sum of only $500 instead of $1,500, alleged to have been due to that firm for services as attorneys for the trustee. Fifth, the allowance to the trustee of only the sum of $41.95, instead of $83.90, to cover the traveling expenses of Pillsbury, Madison & Sutro in connection with the settlement of the estate. Sixth, the allowance to the trustee for Sylvester D. Townsend, Jr., Esq., of only the sum of $2,575 as compensation for services as attorney for the trustee, instead of $4,000 as alleged by him to be due. Seventh, the allowance to the trustee of only $202.70 to cover the traveling expenses of Mr. Townsend, attorney for the trustee, on his trip to California, instead of $405.40, as claimed by him.

[1] The referee properly disallowed the alleged claim of Vail for services and expenses. In the supplemental report of the Wilmington Trust Company, one of the receivers, made under oath November 20, 1914, it is stated that June 10, 1914, that company received a certain bill and claim from Vail reading as follows:

"22 May, 1913.

"Charles J. Cull and Wilmington Trust Co., Receivers Union Dredging Co., to Richard H. Vail, 68 Washing Square South, New York, Dr.

| | |
|---|---:|
| To railroad and Pullman, | $ 133.85 |
| To expenses | 59.40 |
| To services, 10 days | 1,000.00 |
| | 1,193.25 |
| By cash | 250.00 |
| To balance, | $ 943.25" |

In its supplemental report reference was also made to the claim asserted by Vail, as follows:

"With respect to said claim, Wilmington Trust Company reports that until said tenth day of June it had no knowledge whatever that the said Richard H. Vail had been employed to perform any services for the said Receivership Estate; that it never was consulted with reference to the employment of the said Richard H. Vail; that it has never at any time ratified the employment of the said Vail or the validity and sufficiency of said claim; that upon information and belief it avers that the services so rendered by the said Vail were useless and valueless to said Receivership Estate, and that the said employment of the said Richard H. Vail was without authority of law."

The supplemental report of Cull, one of the receivers, made under oath November 17, 1914, states:

"At a meeting of the executive committee of the Union Dredging Company, held March 20th, 1913, at which all the members thereof were present, the following resolution was adopted:

" 'Resolved that Mr. Richard H. Vail be employed and authorized on behalf of the company to go to Folsom to investigate the operations of the company

there, with full power to assume charge of operations, discharge or suspend the superintendent, employees and working men, and engage others on behalf of the company.'

"Mr. Vail started on his trip about the 5th of April, and on the 11th of April the company went into the hands of receivers. The directors of the company (Messrs. Griggs, Gillinder, Gorgas and Cull) thought it would be best for Mr. Vail to continue to Folsom and make his report on conditions there, irrespective of the receivership proceedings, and I accordingly telegraphed Mr. Vail as follows:

"'Jersey City, N. J. April 11th, 1913.

"'Mr. Richard H. Vail, Care of Tennessee Copper Co., Copper Hill, Tennessee.

"'Dredging company filed petition voluntary bankruptcy yesterday. Court appointed me receiver. Will start for Folsom tomorrow evening. Would like you to come earliest possible. Wire me when you will be there.'

"Mr. Vail arrived in Folsom early in May and made an examination of the property there, copies of which report were forwarded by Mr. Vail to Messrs. Griggs, Gillinder and myself. Mr. Vail's bill for services was filed with Messrs. Griggs, Baldwin and Baldwin, who were attorneys for the receiver, and I assumed the same had been transmitted by them to the referee for consideration. It was not until early in June, 1914, when the Wilmington Trust Company sent me for signature a 'report of the receivers' that I learned that Mr. Vail's bill had not been filed with the referee. I then mailed the bill to the Wilmington Trust Company."

The circumstances under which Vail went to Folsom exclude any reasonable idea of his having been employed by the receivers or either of them acting as receiver. By the order of April 10, 1913, appointing the receivers it was provided that they should "take charge of all the assets of said bankrupt and preserve the same, pending the election and qualification of the trustee herein, or until the further order of the court. * * * And that said receivers be and they are hereby authorized to take such proceedings as may be necessary in the District Court of the United States for the Northern District of California to secure the appointment of an ancillary receiver in bankruptcy by said court, to take charge of and preserve the assets of the bankrupt in said district until the election and qualification of the trustee herein or until the further order of said court." It is evident for several reasons that Vail was not authorized to visit Folsom and do what he did in connection with that trip by anything contained in the order of appointment, even if, under any circumstances, that order could be treated as broad enough in its terms to cover such an authority. In the first place the resolution of the executive committee of the Union Dredging Company, of which committee Cull was a member, was adopted March 20, 1913, some three weeks before that company filed its petition in bankruptcy and the receivers were appointed. In the next place, the authority conferred upon Vail under the resolution was wholly inconsistent with any power, express or implied, contained in the order appointing the receivers; for by that resolution Vail was "employed and authorized on behalf of the company to go to Folsom to investigate the operations of the company there, with full power to assume charge of operations, discharge or suspend the superintendent, employees and working men and engage others on behalf of the company." Again, Vail "started on his trip about the 5th of April, and on the 11th of April the company went into the hands of receivers," and the directors of the company, including John W. Griggs and Cull

"thought it would be best for Mr. Vail to continue to Folsom and make his report on conditions there, irrespective of the receivership proceedings." These circumstances clearly indicate that Vail was not employed by the receivers, or either of them acting as receiver, but was employed by and on behalf of the company "irrespective of the receivership proceedings," and satisfactorily account for the fact that the Wilmington Trust Company had not as trustee or receiver notice of any alleged claim for so long a time. Further, and as confirmatory of the above conclusion, Cull swears that Vail arrived in Folsom early in May, made an examination of the property there, and forwarded copies of his report to "Messrs. Griggs, Gillinder and myself," all directors of the bankrupt, but not to the Wilmington Trust Company, which had qualified as a receiver April 12, 1913. It is suggested by counsel for Vail that it does not appear that the latter was ever notified or had an opportunity to be heard; but Vail's alleged claim was filed with the referee November 23, 1914, more than two weeks before the referee made his order thereon, and it does not appear that Vail made any application to adduce testimony or be heard; nor in his petition for review is any such point raised. * * *

[2] The order of the referee allowing Griggs, Baldwin & Baldwin only $130.08 as a set-off against the sum of $500, received by them from the Union Dredging Company before bankruptcy, and directing that the difference be turned over to the trustee, must be modified. In their petition for compensation as attorneys for the bankrupt Griggs, Baldwin & Baldwin set forth that "April 8, 1913, they were consulted by the officers and directors of the bankrupt with respect to the filing of a petition in voluntary bankruptcy"; that they "prepared a form of resolution to be passed by the board of directors, authorizing such action, and thereafter prepared and had verified a petition for the adjudication of the above named bankrupt as a bankrupt, schedules of its debts and assets, and also a petition for the appointment of a temporary receiver of its property"; that they placed themselves in communication with the clerk of this court to ascertain whether the District Judge would be in Wilmington on the next following day; that on that day they sent a representative to Wilmington for the purpose of filing the said petitions; that April 10, 1913, they again sent a representative to Wilmington to file the petitions for the adjudication and the appointment of a receiver respectively; that the District Judge being absent from the district application was made to the referee, who made the adjudication, appointed the receivers and fixed the amount of their bonds; that the petitioners secured the bond for Cull as one of the receivers and filed the same in this court; that they successfully resisted an application to vacate the adjudication in bankruptcy; that they sent a representative to attend the first meeting of creditors June 12, 1913; that in connection with their services they made disbursements as follows: Blanks for schedules, $1.50; amount paid clerk for filing papers and other expenses to Wilmington on six trips, $79.68; amount paid referee, $17; and telegrams, $3.90; aggregating $102.80; and that "prior to the filing of the petition in bankruptcy your petitioners received from the bankrupt $500 on account of services to be

rendered and disbursements made in these proceedings." Section 60d of the Bankruptcy Act provides:

"If a debtor shall, directly or indirectly, in contemplation of the filing of a petition by or against him, pay money or transfer property to an attorney and counselor at law, solicitor in equity, or proctor in admiralty, for services to be rendered, the transaction shall be reexamined by the court on petition of the trustee or any creditor and shall only be held valid to the extent of a reasonable amount to be determined by the court, and the excess may be recovered by the trustee for the benefit of the estate."

It does not appear that any petition for the reexamination of the $500 transaction has been presented by the trustee or any creditor of the bankrupt estate. Such a petition is a condition precedent to any determination by the referee that any portion of the amount paid to an attorney, as specified in the section, may be recovered by the trustee for the benefit of the estate as an excess over and above what is reasonable. But while the circumstances do not present a case in which, under section 60d, an order in invitum for the payment to the trustee of such excess may be made, the fact nevertheless remains that, in the opinion of this court, the sum of $500 received by Griggs, Baldwin & Baldwin was ample compensation for any and all proper and legitimate services and disbursements on account of which they allege they received that sum. The order of the referee for the repayment of the excess must be set aside. But the petitioners, having on their own showing, been fully paid, if not overpaid, for their services and disbursements for which they claim an allowance, are not entitled to receive the sum of $102.08 above mentioned or any part of it, and the same is disallowed. The principles of equity as administered by courts of bankruptcy will not justify any other conclusion.

The order of the referee disallowing compensation claimed by Griggs, Baldwin & Baldwin to be due them as attorneys for Cull, one of the receivers, and for disbursements, must be approved and confirmed. The referee holding the court of bankruptcy appointed the Wilmington Trust Company and Cull as co-receivers, to co-operate as joint receivers, without conferring upon either of them authority to act independently of the other. The receivers did not employ Griggs, Baldwin & Baldwin as their attorneys. They do not claim that such was the fact, but state that their firm was retained only by Cull. Further, no proper proof has been adduced as to the nature and extent of their alleged services or disbursements. Their alleged claim rests wholly upon the bare statement in their petition. In addition to what has been said, the court is strongly impressed with the idea that, in view of the above mentioned payment of $500 to that firm prior to the bankruptcy, the confirmation of the order of the referee cannot work an injustice to its members.

[3] The order of the referee allowing to the trustee for Pillsbury, Madison & Sutro only $500, instead of $1,500, alleged to have been due to that firm for services as attorneys for the trustee, must be modified. I am satisfied they should be allowed $1,500, as claimed by them. That they were competent to and did render valuable services to a large amount to the trustee abundantly appears in the case. Their services related to two classes of subjects: First, those which

do not call for the professional skill of a lawyer and ordinarily would not justify his employment; and, secondly, those which necessitate or reasonably require legal advice. As a general rule an allowance should not be made to a trustee in bankruptcy for compensation for an attorney employed by him for doing such things for the protection and benefit of the estate as do not require professional skill but are well within the ability of a person possessing ordinary intelligence and business capacity. Such things it is incumbent upon the trustee in the discharge of his duty to attend to without burdening and depleting the estate committed to his charge. The determinative question is not whether it is agreeable and convenient to the trustee to have attorneys to act for him, but whether it is reasonably necessary for the welfare of the estate that counsel should be so employed. This rule, in the absence of special elements of difficulty, has general application with respect to such matters as the payment of taxes, the collection of rents, the payment for water and electricity, and the continuance of insurance in force. But it appears from the record that there were special difficulties in successfully attending to these matters, which could be overcome through the personality of Pillsbury, but probably would have proved insurmountable without his intervention. Sylvester D. Townsend, the vice-president of the trustee, testified to the effect that the insurance on the property of the bankrupt in California was in bad shape; that he was informed by Harlan G. Scott, a director of the trustee, that Pillsbury "was considered one of the ablest men on the coast and, probably, a man who could accomplish what we wanted him to do"; that the reason for the selection of counsel in San Francisco was because "all of the companies that we were insured in had their agents there"; that "the water company, upon whom we were entirely dependent, had their office there, and the electric light company who furnished us the electricity, had their office there"; that Mr. Pillsbury "took up with these insurance agents out there the matter of insurance, and by reason of his standing in the community, prevailed upon them to extend this insurance temporarily"; that "if it had not been for his services in San Francisco it would have been impossible for us to have continued this insurance, because it was the kind of insurance that nobody wanted"; that "we were satisfied that Mr. Pillsbury was a man whom we could place entire confidence in, having known him so well and so favorably"; that he "was a big enough man out there to get anything that anybody else could get"; that "we realized that it was almost entirely a matter of his personality in securing a continuation of this insurance"; that "that was equally true as regards the water company there"; that "it was absolutely necessary that we have a supply of water, otherwise the dredge would depreciate very rapidly, if not kept in water"; that "it was a continual effort on the part of Mr. Pillsbury to keep the insurance on the dredge"; and that "only his personal equation and standing in that community enabled him to keep the insurance in force." In view of the foregoing considerations I think it was reasonable and proper that Pillsbury should render and be fairly compensated for the services with respect to those items which, aside from special difficulty, should have been attended to by

the trustee without the expense of professional advice. But the services of Pillsbury, Madison & Sutro were not confined to such details of ordinary business management but extended to important matters arising under the laws of California and involving professional knowledge and skill. Without going more minutely into the subject, I am satisfied that the sum of $1,500 claimed by and for them for compensation should be allowed.

The order of the referee allowing to the trustee only $41.95 to cover the traveling expenses of Pillsbury, Madison & Sutro, instead of $83.90, the amount claimed by them, is disapproved. I can perceive no reason why the full amount claimed should not have been allowed, and the order of the referee is modified accordingly.

The order of the referee allowing to the trustee the sum of $2,575 as compensation to Sylvester D. Townsend, Jr., as its attorney, instead of $4,000 as claimed, must be approved and confirmed. The bankruptcy act intends and contemplates for the benefit of creditors an economical settlement of bankrupt estates, and pursuant to this policy section 62 provides that "the actual and necessary expenses incurred by officers in the administration of estates shall, except where other provisions are made for their payment, be reported in detail, under oath, and examined and approved or disapproved by the court." Among the legitimate expenses of administration is proper and moderate compensation for legal services rendered to a trustee in bankruptcy in so far as such professional aid is necessary. If there be no necessity for the employment of counsel neither the court nor the trustee should direct or provide for it. And if there be such necessity and one or two attorneys be sufficient it would be an abuse to secure three or four. There were but few matters presented to the counsel for the trustee involving questions of any difficulty or delicacy. Among them probably the most prominent was the issue of trustee's certificates in order to raise sufficient money to pay the balance due on the conditional sale of the placer dredge, and thereby acquire title to it. But it appears not only from the accounts rendered by Pillsbury, Madison & Sutro, but from his own account, that on the question of the issuance of trustee's certificates as well as on other questions involving professional knowledge, he was in conference or correspondence with Pillsbury, Madison & Sutro, and was largely guided and assisted by them in the consideration of the points involved. And with respect to the questions raised by the application for the issuance of trustee's certificates, as the same was presented and argued before this court, counsel other than Mr. Townsend, representing creditors, took a very leading and important part. A very large number of items of charge made by Mr. Townsend for alleged professional services rendered to the trustee relate to insurance, taxes, collection of rents, and water and electrical supply, involving no legal question, or consideration other than could be had from ordinarily well-informed business men. Items of insurance form a large proportion of the services for which compensation is demanded. These were matters which required and received attention from Pillsbury, Madison & Sutro in California, and compensation is allowed to them as above indicated, because the personality of Mr. Pillsbury was

a necessary element of success. But that consideration does not apply to Mr. Townsend. These matters were merely part of the essentially non-professional management of the estate which the trustee should not have called on Mr. Townsend to attend to personally and on a professional basis. And if under any circumstances they might have been otherwise viewed by the trustee there was and could have been no reason or justification for the employment of both Mr. Townsend and the firm of Pillsbury, Madison & Sutro to attend to them. There was no litigation of any importance in which Mr. Townsend took part. Nothing, however, that is here said is intended to convey the impression that he did not render meritorious legal services to the trustee. He certainly did in connection with the issuance of trustee's certificates and also in other respects. But for such services he will be liberally compensated by the allowance of $2,575 made him by the referee. I attach but little weight to the opinions of the several lawyers who testified in favor of Mr. Townsend's claim for compensation for two reasons. First, with two exceptions, without having actual knowledge upon the subject, they based their testimony upon Mr. Townsend's statements of the nature and amount of his services; and, secondly, and not of less importance, it does not appear that any of the lawyers knew or took into consideration the extent of the assistance received by Mr. Townsend from other lawyers as above stated. After a careful examination of the record and proceedings transmitted by the referee to this court it does not appear to me that Mr. Townsend has suffered any injustice at the hands of the referee.

The order of the referee allowing to the trustee only $202.70 to cover the traveling expenses of Mr. Townsend, attorney for the trustee, instead of $405.40 as claimed by him, must be modified. I have grave doubt whether, in view of the professional standing and skill of Mr. Pillsbury, as testified to by the vice-president of the trustee, it was necessary that Mr. Townsend should go to California. I do not perceive that he accomplished anything in California which could not have been effected by Pillsbury, Madison & Sutro, under instructions by mail from the trustee or its local attorney. But evidently the trustee thought it desirable that Mr. Townsend should go to California in behalf of the estate, and it also appears that Pillsbury, Madison & Sutro desired his presence there. Under these circumstances whatever doubt there may be on the subject should be resolved in Mr. Townsend's favor. And that doubt having been so resolved, I fail to perceive any consistency in disallowing one-half of his traveling expenses. The order of the referee must, therefore, be modified to the extent of allowing to the trustee the sum of $405.40, the amount claimed.

The receivers, the trustee, and their counsel have not given sufficient attention or weight to the fact that it is the function of the court, and not of the receivers, the trustee, or their counsel, independently of the court, to "cause the estates of bankrupts to be collected, reduced to money and distributed" and "to make such orders * * * as may be necessary for the enforcement of the provisions of this act." Had they taken a different and correct view of the scope of their authority much of the embarrassment and expense which mark the

administration of the bankrupt estate before the court would have been avoided, and a simpler and more economical course have been pursued to the advantage of the creditors, for whose benefit, and not for that of the receivers, trustee and their counsel, the adjudication in bankruptcy was mainly intended.

An order and decree in conformity with this opinion may be prepared and submitted.