### In re COMPUTER LEARNING CENTERS, INC., Debtor.

#### No. 01–80096–RGM.

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Aug. 9, 2002.

James M. Lewis, Holland & Knight, LLP, McLean, VA, for Accountant for trustee Frank & Company.

H. Jason Gold, Gold, Morrison & Laughlin, P.C., for trustee.

### *MEMORANDUM OPINION*

ROBERT G. MAYER, Bankruptcy Judge.

The issues before the court concern interim applications for compensation of the trustee, his accountant and his counsel.[1]

### *Case Background*

This is an unusual chapter 7 case because of the size of the estate and the number of claims. The trustee has received more than $31,000,000 from the liquidation of assets to date. More than 2,800 proofs of claims were filed by the bar date. By way of comparison, the Executive Office of the United States Trustee reports that from January 1, 1994, through December 31, 2000, there were 5,815,152 chapter 7 bankruptcy filings. During this period 205,748 were closed as asset cases. Only 3,179 of these asset cases had assets over $500,000. "United States Trustee Program: Preliminary Report on Chapter 7 Asset Cases 1994 to 2000", June 2001, at Figure A–1 and Appendix D. These 3,179 large asset cases generated more than 50% of assets paid to creditors in all asset cases. In 2000, 466 chapter 7 cases with receipts of more than $500,000 each were closed. The total receipts for these 466 cases was $966,189,000. *Id.* Appendix D. In Virginia, 436 asset cases of all sizes were closed in 2000. The total receipts in those cases was $20,914,000. *Id.* Appendix C.

Computer Learning Centers, Inc. ("CLC") was a nationwide computer training school. At the time, it filed bankruptcy it had more than 9,000 students and more than 1,600 employees at 25 schools located throughout the United States. The trustee sold most of the schools as going concerns within 60 days after the filing. This generated about $22,000,000 in receipts and significantly reduced potential claims, particularly potential lease rejection claims and student claims. The trustee was authorized to operate the debtor's collection division to maximize the collection of the approximate $8,000,000 in value of outstanding accounts receivables, principally student loans. Tr. 2/8/01 at 39. The trustee operated the division for almost fifteen months, collecting about $3,400,000 through February 2002, and an additional $2,200,000 when he sold the balance of the receivables. The division is now closed. The trustee was also authorized to establish and operate a records retention center. The purpose was to assemble all student records and business records from across the nation so that the student records could be disposed of according to law—generally to the successful purchaser of the schools or to state agencies—and that the business records could be available to the trustee to evaluate the proofs

---

1. The trustee's law firm was employed as counsel for the trustee.

of claims filed and potential claims against third parties, such as preference claims.

The trustee, his law firm, and his accountant filed multiple interim fee applications. The trustee's accountant, Frank & Company, requests $465,781.25 in fees and $75,072.18 in expenses; the trustee's law firm, Gold, Morrison & Laughlin, P.C., requests $283,795.50 in fees and $52,085.61 in expenses; and the trustee requests $188,042.45 for trustee fees. These applications are considered in this opinion.[2] All are interim applications except the sixth fee application of Gold, Morrison & Laughlin which is its final application. As of April 30, 2002, the closing date for the fee applications, the trustee had disbursed $9,199,461.30. Of this amount, $1,868,584.76 was paid to professionals and the trustee.

### Issues Presented

The issues raised with respect to the accountant's interim fee applications now pending before the court are (i) the accounting firm's hourly rates and time expended; (ii) the scope of its employment, specifically, whether business or management consultation services are included in accounting services; (iii) the extent, if any, to which the accountant performed the trustee's duties; (iv) the accountant's failure to disclose the firm's dual rate structure and its unilateral decision to charge the bankruptcy estate its highest rates; (v) the firm's use of quarter-hour minimum time increments; and (vi) the fees and

expenses requested in connection with preparing and prosecuting its fee applications. The issues raised with respect to the pending interim fee applications filed by the trustee and by his law firm are (i) the trustee's and the law firm's hourly rates; (ii) the allocation of time expended between the trustee's application and his law firm's application, that is, whether the law firm performed trustee duties; and (iii) the increase in hourly rates in the sixth fee application of trustee's law firm and the fourth application of the trustee.

### I. Frank & Company

### A. Rates and Hours

The same procedure is used to determine a reasonable fee for accountants as attorneys: the hourly rate is determined; the reasonable number of hours expended is determined; the product of the two, absent adjustment, is the fee. *Blum v. Stenson*, 465 U.S. 886, 888, 897, 104 S.Ct. 1541, 1544, 1548, 79 L.Ed.2d 891 (1984); *In re Narragansett Clothing Co.*, 210 B.R. 493 (1st Cir. BAP 1997). The applicant has the burden of proving that the claimed rate and number of hours are reasonable. *Blum*, 465 U.S. at 897, 104 S.Ct. at 1548.

There were several hearings on the accountant's applications for compensation. Robert Frank was the principal witness supporting Frank & Company's application for compensation.[3] The only evidence at these hearings as to the reasonableness of the firm's hourly rates was Frank's conclu-

---

2. Frank & Company has already been awarded $210,455.75 in fees and $22,752.40 in expenses; Gold, Morrison & Laughlin, $205,632.00 in fees and $22,752.40 in expenses; and the trustee, $100,000.00 in interim fees.

3. Frank is one of four owners of the accounting firm and the sole named principal. He holds an undergraduate degree from Louisi-

ana State University and a Master of Science in Accountancy from Texas Tech University. He is licensed as a certified public accountant in Virginia, Texas and California. Tr. 2/8/01 at 43. He has practiced as a CPA for approximately 25 years. Tr. 7/23/01 at 24; Tr. 2/8/01 at 42. He worked with this trustee on 30 to 40 previous bankruptcy cases. Tr. 7/23/01 at 25.

sory statement that his firm's fees were "reasonable."[4] There was no testimony as to the basis for his opinion or the prevailing market hourly rate for accountants. Frank's testimony was not sufficient to carry the firm's burden of proof.[5] *Narragansett Clothing Co.*, 210 B.R. at 498; *In re W.G. Shuckers, Inc.*, 232 B.R. 524, 528 (Bankr.S.D.Ga.1999) ("[T]he award must be supported by more than conclusory statements.")

The court appointed W. Thomas Miller, III, a certified public accountant, under Federal Rule of Evidence 706 to testify as an expert as to the reasonableness of Frank & Company's hourly rates and hours expended. Miller submitted his report ("Report") and testified at the final hearing on the fee applications.

Miller's Report was carefully prepared. He met with and interviewed the interested parties, reviewed the application to employ Frank & Company, reviewed all of Frank & Company's fee applications, including the first application that had previously been approved by the court, obtained each accountant's hourly rate, resume and time records, reviewed various professional publications including surveys relating to accountant's fees nationally and throughout Virginia, and interviewed various individuals both within Frank & Company and outside the firm. He concluded, "Based on the guidance provided by the

---

4. At the July 23, 2001, hearing Frank testified at length as to the work done. With respect to the hourly rates, he testified in response to the trustee's question:

> Q And you said based on your experience as a CPA working in bankruptcy and non-bankruptcy matters, that the work performed by Frank & Company was necessary and the charges were reasonable?
> A In my opinion, all the activities we have pursued were very necessary, were done in a very efficient way. . . . our [average] hourly rate runs around $152 per hour, which in today's environment, is a very reasonable rate, in the context of accounting firms.

Tr. 7/23/01 at 45–46.

At the September 25, 2001, hearing Frank testified that "I believe we've accomplished a lot at a very reasonable hourly rate blend to the Trustee." The "blended rate" was "from memory, I believe . . . $168". Tr. 9/25/01 at 19 (Docket Entry 471). "I'm well aware of consulting rates within the Washington community, whether it be from a Booz Allen—which would only be amused at the particular rates that we've provided the Trustee—to sole consultants out there, who provide re-org and bankruptcy work." Tr. 9/25/01 at 19 (Docket Entry 471).

5. Frank's testimony was not convincing. Ronald Guberman, the chairman of the Unsecured Creditors Committee and a layman, cross-examined Frank. He expressed concern at the magnitude of the accounting fees and the fact that they were continually mounting which necessarily diminished the funds ultimately available for unsecured creditors. Tr. 9/25/01 at 6, 10, 13 (Docket Entry 471). In particular, he was concerned about the fees charged for Dean Popps. The accounting firm charged $110,260.00 for Popps' services for the period from January 25, 2001, through July 31, 2001. Popps was hired by Frank & Company especially for this engagement. The hourly rate charged by the firm for his time was $185 which was comparable to the hourly rates charged by the accountants at the firm. Seeking information about this rate so that he could make a determination of its reasonableness, Guberman asked Frank what the firm paid Popps. Guberman was seeking to determine the multiple applicable to Popps hourly rate charged to the estate. Despite Popps extensive involvement in the case and Frank's position with the firm, Frank testified that he did not know. In response to other questions, Frank gave lengthy responses that were so general as to be of limited use. The absence of knowledge when one would have expected Frank to have had the information and his evident disdain at being questioned about the propriety of the services his firm rendered and their fees substantially undercut the value of his testimony. *See generally*, Tr. 9/25/01 4–22 (Docket Entry 471).

AICPA [American Institute of Certified Public Accountants] and based on the comparison of Frank & Company to other firms nationally and within the State of Virginia, we determined that the fees charged CLC by Frank & Company were reasonable." Report at 8.[6]

6. Miller's principal analysis of the reasonableness of the hourly rates for the salaried accountants and employees of Frank & Company was based on a "cost approach." He obtained information from Frank & Company about the cost of each employee and the hourly rate charged to the estate. He then computed the multiple—the firm's "markup"—and compared that multiple to multiples reported by accounting firms of similar size. The reported multiples were from an AICPA national survey and a Virginia survey. The multiples computed by Miller for Frank & Company were within the range reported in the surveys. The cost approach was not applicable to the four principals in the firm because they were not compensated on a salary basis. To determine the reasonableness of the principal's hourly rates, Miller surveyed other Northern Virginia accounting firms of similar size and experience. Based on this survey, Miller concluded that the principal's hourly rates were also reasonable. In the survey process, he also obtained survey information about hourly rates for the non-principals.

There is a similarity between Miller's analysis and the more familiar real estate appraisal analysis. Real estate appraisers use three methods to determine the value of a property: the market or sales approach, the cost approach and the income approach. Miller's multiplier analysis is analogous to a real estate appraiser's cost approach and his survey analysis to the market approach. Here, the survey approach is the best. It permits direct comparison between the rates charged by different firms and permits a more reliable determination of the prevailing market rates. *Blum,* 465 U.S. at 892, 104 S.Ct. at 1546 ("In all four of the cases cited by the Senate Report, fee awards were calculated according to prevailing market rates. None of these four cases made any mention of a cost-based standard."). The use of multiples, like a cost approach for real estate appraisals, is helpful, but by its nature is principally corroborative.

Miller's market survey well supports his conclusion that the hourly rates charged are reasonable, a conclusion also supported by his multiplier analysis. While other factors may also be taken into account in determining the hourly rate or in adjusting the total fee computed, no upward or downward adjustment was requested or is indicated.[7]

The weaknesses of the multiples analysis are apparent from Miller's report. He stated: When calculated correctly the standard billing rate multiple takes into consideration all of the relevant factors necessary for operating a profitable firm. The multiple will take into consideration direct salaries, indirect costs such as overhead and the firm's philosophy as to what constitutes an adequate profit for the owners. All of these factors are directly impacted by the same economic pressures faced by all firms competing in the same geographic location. Report at 5. The application of these factors can lead to a wide range of hourly rates with no assurance that the result will be within the prevailing market rate. The accuracy of the premise of the approach, that within a market area all accounting firms face substantially the same costs is not readily apparent. Overhead expenses can vary substantially. Some firms opt for expensive, luxury office space; others for less expensive, more modest space. A portion of costs is discretionary. Some firms continually update their computer systems with every new advance; others wait until the advances are significant. The firm's "philosophy as to what constitutes an adequate profit for the owners" is itself subjective and differs from firm to firm. One firm's "adequate profit" is another's despair.

The most significant drawbacks to the multiplier analysis, however, are the significant number of firms that do not set their fees by using multipliers and the testimony of Hal Young, another principal at Frank & Company, that Frank & Company does not use multiples in setting its rates.

Nonetheless, the use of multiples is relevant and helpful as it establishes a range of reasonable rates and thereby confirms the market survey and the rates charged.

7. Frank & Company's sixth fee application reflected an increase in its hourly rates. The increase in hourly rates was not disclosed to creditors in the notice of the hearing and was

In this case, however, there are additional bankruptcy considerations that Miller was not requested to address. In the course of his preparation, Miller determined that Frank & Company maintained a dual rate system and had charged the bankruptcy estate the higher rate. This was not previously disclosed to the court. Other bankruptcy considerations that Miller did not analyze were (a) whether business or management consultation services were included in accounting services in the employment order, (b) whether the accountant performed trustee duties; and (c) the firm's use of quarter-hour minimum time increments. Even if the fees charged were otherwise reasonable for the work done, if the accountants exceeded the scope of their employment, performed trustee's duties, failed to make adequate disclosure to the court or failed to use the proper minimum time increment, adjustments would need to be made.

### B. The Nature and Scope of the Employment

The first question presented is whether Frank & Company exceeded the scope of its authorized employment when it performed business consultation services. The application to employ Frank & Company stated that the trustee required the services of:

> accounting professionals to, among other things, assist in the collection of the outstanding Accounts, to analyze the Debtor's financial records, to assist with tax and other financial reporting re-

quirements, and to provide other accounting and financial analysis services as may be necessary in the operation, preservation, liquidation and recovery of the Debtor's assets.

Application to Employ Frank & Company, ¶ 3 (Docket Entry 8). The employment application was granted by order entered on February 8, 2001. The fee applications filed by Frank & Company reflect that Frank & Company provided more services than those described in the employment application. In addition to the expected accounting services, the firm also provided significant business management and consultation services. This finding was, in fact, material to Miller's determination of the proper hourly rate. "Frank & Company charges different hourly rates for individual time-keepers depending on whether the engagement is a business management/consulting service or is a 'traditional' accounting service." Report at 3. "Once Frank & Company has determined that the overall engagement has been defined as either a business management/consulting service or as a traditional accounting service, then the hourly rates are consistently charged." Report at 4. In this case, Frank & Company determined that this engagement was a business management/consulting service and charged its business management/consulting hourly rate for all services rendered during the engagement. Its average business management/consulting hourly rate is 18.1% higher than its average traditional accounting hourly rate.[8] Report at 4. Thus,

---

not discussed in the application. At the hearing on the sixth fee application, no evidence was presented as to the reasonableness of the increased rates. Absent evidence, the court will use the most recent rates shown to be reasonable, those identified by Miller in his report. *See In re First Software, Corp.,* 79 B.R. 108, 119 (Bankr.D.Mass.1987)(rejecting the proposition that "the passage of time

alone warrants an automatic increase in counsel's hourly rate").

**8.** As indicated, this is based on the average hourly rate. Individual hourly rates differed from 9.38% to 25.00%. Whether the entire bill would be reduced by 18.1% if the lower rate were uniformly used depends on the relative amount of time expended by each time-keeper

the determination of whether Frank & Company exceeded the scope of its employment has two ramifications: first, whether the work is compensable in any event; and second, the proper hourly rate applicable to the work performed within the scope of the employment.

The employment application in this case envisioned the employment of an accountant to perform accounting services. It did not request the employment of a business or management consultant. *See In re Wang Laboratories, Inc.,* 154 B.R. 392, 396 (Bankr.D.Mass.1993). The trustee and the accountant recognize the distinction between management consultation services and accounting services but argue that management services are within the ambit of the employment application. At the May 22, 2001, hearing, the trustee stated that he had sought to hire the debtor's chief financial officer to assist in the administration of the estate. 5/22/01 Tr. at 6. The trustee intended to hire the former chief financial officer under his limited authority to operate portions of the debtor's business. *See* Trustee's Memorandum in Support of Motion to Operate Debtor at 7 (Docket Entry 13). The budget approved by the court for the operation of the debtor's business included a line item for salaries for the former CFO and others.

However, the trustee and the former CFO were unable to agree on employment terms, the trustee believing that the requested compensation was excessive. Left without a CFO, the trustee turned to the accounting firm whose employment had previously been approved by the court and which undertook to perform those functions. The trustee stated, "So the accounting firm did, in my view, work that would have been under the ambit of the CFO." 5/22/01 Tr. at 6.

Frank testified at the July 23, 2001, hearing in support of the Frank & Company fee application that he is a certified public accountant and a management consultant. 7/23/01 Tr. at 24. "My role in this case has been to assist the Trustee, as he deems necessary, and to assume many of those functions as a CFO." 7/23/01 Tr. at 24.[9] "[W]e assisted [the trustee] in assuming many of the day-to-day tasks associated with operating the divisions that [the trustee] had been authorized to continue." 7/23/01 Tr. at 34. Frank testified that his services fell within four main areas. The first was the operation of the accounts receivable division.[10] This was accomplished principally by Dean Popps, an individual hired by the accounting firm as a consultant who also performed other tasks for the accounting firm.[11] The sec-

who worked on the case. Miller computed the overall difference to be 19%.

**9.** This was graphically illustrated by the trustee's Exhibits 2 and 3 introduced at the July 23, 2001, hearing. Exhibit 2 is the organizational chart as originally envisioned. It shows Frank & Company as an advisor to the trustee responsible for general ledger accounting. The former CFO is shown as managing two groups, the collections division and "Technology & Systems." The former CFO is further shown as reporting to the former president of the debtor who is shown as reporting to the trustee. Exhibit 3 is the actual organizational chart. It shows Frank & Company as the chief financial officer responsible

for operating three groups, the general ledger accounting, the collections division and "Technology Compliance Support and Systems Support" group. The accounting firm is shown reporting to the trustee.

**10.** The trustee was authorized to operate the accounts receivable division and the records retention division.

**11.** The employment application did not disclose that Frank & Company hired Popps specifically for this case. In August, 2001, the trustee was authorized to hire Popps directly at the rate of $10,000.00 per month. Frank & Company billed $110,260.00 for

ond was the records retention division. Frank & Company designed the facility, coordinated the retrieval of the documents from the schools from across the country and managed the division.[12] The third area was technology. An employee dismantled the debtor's computer system at its headquarters, supervised the move to the records retention facility, set the system back up, and maintained it in working order.[13] In addition, the accounting firm maintained the debtor's website.[14] The fourth area was financial services, particularly, the maintenance of the trustee's books, the oversight of the books relating to the accounts receivable division, the preparation of budgets for the trustee and financial reviews, particularly of the First Union secured claim.

At the September 25, 2001, hearing, the chairman of the Unsecured Creditors Committee asked Frank what his firm did "beyond what's considered basic accounting." Frank replied:

> [M]ost accounting firms at this juncture have expanded well beyond the traditional nature of the general ledger, providing consulting services to their client base in—in the technology area, in the management advisory area, in the resource allocation areas.
>
> As a matter of fact many of the larger firms, most of their—a greater percentage of their revenue base is from the consulting area at this juncture versus the traditional financial statement audit

or the accounting area, as the general public has traditionally known us to do.

> So as—we have come before this Court before and discussed the varied activities the firm is pursuing concerning the CLC matter.
>
> I mean, we—we have been asked to assist the trustee beyond the traditional debits and credits, in accounting terminology, but still within the financial realm of accountability and control of environment and ensuring that the various policies are in effect to—to protect those assets, whether that has been through the oversight of the accounts receivable collection department during the reorganization gearing up, ensuring that the integrity of the accounting policies and internal control policies have been maintained to the technology piece, ensuring that the records that have been maintained in the CLC's hard drives, if you would, have been available and— available and transferred to the new owners of the schools.
>
> Q So you'd characterize your actions as you're running the business pretty much, in layman's terms?
>
> A We—we have assisted the Trustee in providing those services that this Court has had [sic] asked the Trustee to pursue.

9/23/2001 Tr. at 7–8.

There is little question that accountants today provide many services in addition to traditional accounting services. There is a

---

Popps' time from January 25, 2001, through July 31, 2001. His hourly rate was $185.00.

**12.** Frank traveled to San Francisco to evaluate the records there and identify the ones to be shipped to the records retention facility in Virginia. The primary purpose was to assure that the estate retained records sufficient to file all required tax returns and to seek a tax refund from California.

**13.** The individual principally responsible for the computer technology services has been employed by Frank & Company for four years. Frank & Company bills him at $175.00 per hour.

**14.** The trustee used the website to keep the many creditors informed of progress in the case, claims procedures and bar dates. He also used it to advertise the sale of the schools at the beginning of the case.

clear distinction, however, between traditional accounting services and management or business consultation services. *In re Diamond T Corporation,* 102 B.R. 95, 96–97 (Bankr.W.D.Tex.1988) ("Court approval of an estate's retention of counsel *qua* counsel does not justify counsel's later billing the estate for management consultant services."). An accountant is defined in the Bankruptcy Code as one who is "authorized under applicable law to practice public accounting." 11 U.S.C. § 101(1). Accountants are regulated by Chapter 44 of Title 54 of the Code of Virginia. Certified public accountants generally hold at least a bachelor's degree, have passed the requisite examinations and are required to annually satisfy continuing education requirements. Section 54.1–4400 defines the "practice of public accountancy" and "public accounting" as "the giving of an assurance, in a report or otherwise, whether expressly or implicitly, unless this assurance is given by an employee to his employer." § 54.1–4400, Code of Virginia (Michie, 2001). "Assurance" is defined as "any act or action, whether written or oral, expressing an opinion or conclusion about the reliability of a financial statement or about its conformity with any financial accounting principles or standards." § 54.1–4400, Code of Virginia (Michie, 2001). Traditional accounting is the preparation or maintenance of books and records of a business enterprise, auditing books and records, preparing tax returns and expressing opinions to the owners or third parties as to the accuracy of financial statements. Not all of these services are "public accounting" as defined by the Virginia Code. Bookkeeping services and income tax preparers are not required to be certified public accountants. These services, in addition to being provided by lay persons, are traditionally provided by accountants and are generally considered within the scope of accounting services that may be provided by an accountant.

Business consultants are not regulated by the state. There are no educational prerequisites and no annual continuing education requirements. An MBA degree is not required. One need not be a certified public accountant to provide business advice or consulting services.

Accounting services and business consultation advice are separate and distinct services. Public accountants are regulated by the state. Business consultants are not. Accountants are required to meet certain educational requirements. Business consultants are not. Accountants review books and records of businesses and give their opinions and assurances about them. Business consultants give their opinions on a multitude of matters, from running a business, to the type of computers and software to buy. Accountants have a duty to give accurate, fair and unbiased opinions to their clients and to third parties even when the opinions are not favorable to the client. Business consultants may at times advocate their client's positions. Their goal is to achieve the client's objectives. These dual roles can create conflicts. *See In re Harold & Williams Development Co.,* 977 F.2d 906, 910 (4th Cir. 1992) (dual appointment as accountant and attorney).

A professional's employment in a bankruptcy case is limited to the employment approved in the order authorizing the employment. *In re New England Fish Co.,* 33 B.R. 413, 420 at n. 1 (Bankr. W.D.Wash.1983). This assures proper management of the case and the professionals. *Id.* at 418. The scope of employment may not be expanded by simple agreement between the professional and the trustee. It must be approved by the court. Both parties are responsible for assuring that the scope is not exceeded.

The fact that a professional is retained for one purpose does not permit him to pursue another without an amended order of appointment. *In re Greenwald,* 145 B.R. 794, 796 (Bankr.S.D.N.Y.1992); *In re Bicoastal Corp.,* 122 B.R. 140, 148 (Bankr. M.D.Fla.1990) (accountant performed legal work). Employment in one professional discipline does not per se prohibit the same individual from being employed in a second professional discipline. *In re Harold Williams Development Co.* However, to be compensated as a professional in each discipline, the individual must be employed as a professional in each discipline. In this case the trustee requested approval for hiring an accountant to perform traditional accounting services. The list of services anticipated to be rendered suggests traditional accounting services. The services involved preparation of financial reports, financial analysis and tax assistance. No mention was made of hiring a business consultant or manager. The business consultation services exceeded the scope of the accountant's employment.

### C. Retroactive Expansion of Scope of Employment

At the hearing on the accountant's fourth fee application, the trustee orally requested that the accountant's scope of employment be expanded so that the accounting firm could be paid for all the services it performed.[15] This is similar to approving the employment of an attorney retroactively. In order to obtain a retroactive enlargement of the scope of employment, the trustee must show that the employment would have been approved originally, that there is no prejudice to the estate or the creditors and that there is good cause for the delayed request.

Frank & Company exceeded the scope of its employment at the request of the trustee. The services rendered with respect to the organization and implementation of the records center and the establishment and maintenance of the computer systems and records previously maintained by the debtor are matters outside the scope of normal trustee duties and experience. In this case, given the magnitude of records, it was appropriate to employ outside professionals to design and implement an efficient and effective records retention and access system. Such systems are necessary to the trustee's successful administration of this case. Had such employment been timely requested, it would have been granted. The work actually benefitted the estate and there is no prejudice to the estate.

Employment of a management consultant to assist the trustee in administering the case is more problematic. This is, in fact, one of the trustee's core responsibilities. To allow such employment raises questions of the extent to which a trustee may properly delegate core responsibilities and whether such a delegation effects a circumvention of the maximum compensation that may be paid to a trustee. *In re Lowry Graphics, Inc.,* 86 B.R. 74 (Bankr.S.D.Tex.1988). In general, such a delegation should not be permitted. There should be no absolute rule because cases differ and the resources necessary to properly administer them will necessarily differ. *United States Trustee v. Porter, Wright, Morris & Arthur (In re J.W. Knapp Company),* 930 F.2d 386 (4th Cir. 1991) ("Only when unique difficulties arise may compensation be provided for services which coincide or overlap with the

---

**15.** The accountant's scope of employment is not in issue with respect to the sixth fee application because the court modified the accountant's scope of employment in November 2001 to substantially curtail business consultation and management services.

trustee's duties."); *In re King*, 88 B.R. 768, 770 (Bankr.E.D.Va.1988) (Bostetter, C.J.). However, the trustee must remain in control of the administration of the case and may not delegate essential decision-making responsibility.

In this case, the trustee could not have personally performed all of his duties. This was recognized early in the case when the trustee was authorized to operate the debtor's accounts receivable center. The trustee anticipated hiring the debtor's chief financial officer at a budgeted amount of $10,000 per month. The CFO would have performed many of the management duties the accountants performed. Had the trustee sought authority to hire a substitute for the CFO when it became apparent that the original plan to hire the CFO would not come to fruition, the court would probably have approved a substitute. It may well not have been the accounting firm, however, and if it had, the appointment would have been significantly limited. It is clear that the magnitude of the accounting firm's involvement in management was excessive and beyond what would have been or should have been approved. The scope of the duties performed was too broad. The expense, if for management services alone, was excessive. The trustee would have, however, been granted some relief. Retroactive approval, to the extent that the work was for necessary and appropriate management services and not the performance of trustee duties, would not prejudice the estate.

■ The third element necessary for retroactive employment is good cause—a good reason that the request was not timely made. Here, that is a difficult question. The accountant acted in good faith, but with his extensive bankruptcy experience, particularly with this trustee, he should have known that he was operating outside his court authorized scope of employment. There are two mitigating factors. First, the case is substantially larger than any other asset chapter 7 case in which the accountant or his firm has previously been involved. Second, the accountant exceeded the scope of his authority early in the case when there was a great deal of activity involving the sale of the schools as going concerns. No one stopped to examine the scope of employment issue after the first two hectic months calmed down. The accountant simply continued to do what he had done almost from the beginning of the case. This is at best a minimal showing of good cause which in other situations may well not be sufficient. However, it is not the purpose of the bankruptcy compensation procedures to penalize professionals for simple oversight particularly where, as here, they acted in good faith and relied on the trustee's request for services.

For these reasons, the scope of Frank & Company's employment will be expanded for the period from the commencement of its employment through November 27, 2001, for services establishing the records retention center.[16] With respect to management services, particularly with respect to the accounts receivable center, much was provided by Popps who the trustee hired directly at the rate of $10,000 per month as of August 1, 2001. This is also the amount that the original budget projected for the chief financial officer. In light of these factors, the scope of the accountant's employment will be expanded to include management services for five months, from February 1, 2001, through

---

**16.** The court restructured the accountant's scope of employment effective November 27, 2001.

July 31, 2001, at the rate of $10,000 per month for a total of $50,000.

### D. Accountant's Duties and Trustee's Duties

■■■■■■ Much of the accountant's remaining work was performing the trustee's duties. The question is whether the professional, here the accounting firm, may be compensated for performing trustee duties and if so, on what terms. The issue is principally one of trustee compensation and arises in the case law almost always exclusively when the trustee has been awarded the maximum compensation allowable under 11 U.S.C. § 326. To allow additional compensation to be paid to other professionals who perform trustee duties allows the restriction imposed by § 326 to be circumvented and may allow a trustee a windfall, that is, to be compensated for work done by others.[17] In this case, the trustee would have been compensated for the additional services had he performed them. The estate benefitted by the accountant performing these services and will obtain a windfall if the accountant is not paid. The law is clear that the trustee may not employ professionals to perform routine trustee duties at the expense of the estate. *In re J.W. Knapp Company*, 930 F.2d at 388; *King*, 88 B.R. at 770. As long as the trustee remains ultimately responsible for the actions of his agents and does not seek to delegate decision-making functions, the purpose for the rule is not offended if additional professionals are employed, perform trustee duties and the total compensation of the professionals and the trustee is no greater than the compensation the trustee would have been awarded had there been no delegation and had the trustee performed all the duties. *In re Abraham*, 163 B.R. 772, 778–79 (Bankr. W.D.Tex.1994); *In re Lowry Graphics, Inc.*, 86 B.R. 74 (Bankr.S.D.Tex.1988) (discussing delegation generally). In fact, in a large case, it may be physically impossible for a trustee to personally perform all of his duties. As long as the delegation of duties does not increase the total cost of administration over the cost of administration had the trustee performed the duties, and the total compensation for trustee duties whether performed by the trustee or a professional is within the limits established by § 326, there should be no per se prohibition against paying a professional for performing the trustee's duties. Such circumstances should be the exception and must be closely scrutinized to assure that the estate is not disadvantaged by additional costs, delays in administration or the substitution of a professional's judgment for that of the trustee.[18] In this case,

17. While some cases indicate that the purpose of the rule is to prevent the trustee from delegating his duties to others, the Bankruptcy Code does not specifically require that a trustee personally perform each and every duty. He must always remain responsible for the performance of his duties, whether performed by himself or delegated to others. He may not delegate decision-making functions. A fiduciary is selected, in large part, because of the confidence that appointing official has in the fiduciary's personal judgment and discretion. This trust and confidence cannot be delegated.

18. This issue was raised early in this case by the court. The first time it was raised was at the hearing on the accountant's first fee application on May 22, 2001, within four months after the case was filed. The accountant's first fee application requested compensation for services that appeared to be the responsibility of the trustee. The trustee believed that all the services rendered were within the accountant's province and were not trustee duties. The trustee was not in a position to put on significant evidence at that hearing as to these issues. The court was satisfied, particularly in light of the compressed time that the trustee had within which to sell the schools and assemble the remaining assets, that the services rendered—whether properly within the accountant's sphere or the trustee's

additional services rendered by the accountant that were trustee duties, that were requested by the trustee and that will not result, when added to the trustee's compensation, in compensation exceeding the maximum compensation allowable to a trustee under § 326(a), will be allowed.

The issue of the proper demarcation between an accountant's duties and a trustee's duties is not new. *In re J.W. Knapp Company*, 930 F.2d at 388. A chapter 7 trustee's duties are principally set out in 11 U.S.C. § 704. They are:

(1) collect and reduce to money the property of the estate for which such trustee serves, and close such estate as expeditiously as is compatible with the best interests of parties in interest;

(2) be accountable for all property received;

(3) ensure that the debtor shall perform his intention as specified in section 521(2)(B) of this title;

(4) investigate the financial affairs of the debtor;

(5) if a purpose would be served, examine proofs of claims and object to the allowance of any claim that is improper;

(6) if advisable, oppose the discharge of the debtor;

(7) unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest;

(8) if the business of the debtor is authorized to be operated, file with the court, with the United States trustee, and with any governmental unit charged with responsibility for collection or determination of any tax arising out of such operation, periodic reports and summaries of the operation of such business, including a statement of receipts and disbursements, and such other information as the United States trustee or the court requires; and

(9) make a final report and file a final account of the administration of the estate with the court and with the United States trustee.

11 U.S.C. § 704. *J.W. Knapp Company*, 930 F.2d at 388.

The trustee must perform all the ministerial and administrative duties of the estate. *Connelly v. Hancock, Dorr, Ryan & Shove*, 195 F.2d 864, 869 (2nd Cir.1952); *In re Spungen*, 168 B.R. 373, 376 (N.D.Ind.1993); *In re Polk*, 215 B.R. 250, 253 (Bankr.M.D.Fla.1997); *Matter of Minton Group, Inc.*, 33 B.R. 38, 40 (Bankr. S.D.N.Y.1983); *King*, 88 B.R. at 770:

Accordingly, attorneys have been denied compensation for: (1) services relating to the sale of the debtor's assets, the collection of accounts due, the examination of the debtor's papers, *In re Eureka Upholstering Co.*, 48 F.2d 95, 96 (2d Cir.1931); (2) the preparation of notices and advertisements for the sale of the debtor's assets, and license renewals, *Taylor*, 66 B.R. at 393–94; (3) entries relating to routine telephone calls and correspondence with information seekers, *Matter of Minton Group, Inc.*, 33 B.R. at 41; (4) charges for the reduction of the estate to money, the payment of routine bills—including taxes, the ar-

---

sphere—were necessary. The court, therefore, allowed the requested fees, with the proviso agreed to by the trustee, that any amount determined at a later hearing to be the responsibility of the trustee individually rather than the estate would be deducted from any future award of trustee fees. Order entered on May 24, 2001 (Docket Entry 300). That issue is now before the court as to the first five fee applications of the accountant.

ranging of insurance coverage for the estate, and the examination of the debtor's books and records, [*In re*] *McAuley Textile [Corp.],* 11 B.R. [646,] 648–49 [(Bankr.D.Me.1981)] (citations omitted); (5) and the arrangement for the sale of the properties of the debtor's estate, *In the Matter of Leader Int'l Indus., Inc.,* 2 B.C.D. 588, 590–91 (Bankr.E.D.Mich. 1976).

*King,* 88 B.R. at 770.

The accountant's first fee application, which was prepared by the trustee's law firm, describes the services rendered by the accountant for each category of services. The first category was "Asset Analysis and Recovery." The description was:

The principal category of tasks performed by Frank & Co. for the Trustee since its employment fall within the ambit of *Asset Analysis and Recovery.* These tasks include the identification of the assets, including such assets as teaching materials, curriculums, and programs, and the assembly of those assets for purposes of analysis, evaluation and liquidation, thereby providing a direct benefit to the Debtor's estate.

More specifically, during the Interim Period, Frank & Co. has assisted the Trustee by restaffing the suburban Philadelphia accounts receivable collection center, assisted in negotiations with the lessor of that facility, assisted in re-establishing and monitoring necessary telephone and other utility services, and re-establishing procedures for the prompt deposit and analysis of receipts. Frank & Co. continues to assist in monitoring and managing this operation on an as needed basis. In addition, Frank & Co. also assisted in establishing procedures for the efficient and accurate transfer of funds from the collections facility as well as for other sources of funds for the Debtor's estate.

Frank & Co. also assisted the Trustee in identifying bank accounts maintained by the Debtor both for headquarters and the twenty-five schools located throughout the country. Frank & Co. also assisted in the consolidation of these accounts to place the funds under the control of the Trustee.

Frank & Co. has and continues to assist the Trustee in locating and consolidating assets at the various school locations, including, as needed, accomplishing site visits to assess, identify and preserve those assets. In particular, Frank & Co. assisted in recovering and safeguarding documents such as promissory notes executed by the students for their educational fees, and other records located at the various schools.

Frank & Co. also assisted the Trustee's appraiser, auctioneer and sales agent, Tranzon Fox, LLC ("Tranzon"), in identifying and evaluating fixed assets at each location by locating schedules of fixed assets and comparing those with inventories of the assets found at each location.

Frank & Co. also inspected the initial financial statements prepared through the Debtor's most recent fiscal year end, January 31, 2001, identified certain assets recorded in the Debtor's general ledger, and reported these assets to the Trustee.

Frank & Co. also assembled a list of all of the Perkins Notes held by the Trustee. The inventory of these notes includes the dates of the notes, the amounts, and the identity of the entity owing the amount. The inventory of these notes will assist the Trustee in identifying, segregating and collecting the notes for the benefit of the estate.

Frank & Company P.C.'s First Interim Application for Payment of Fees and Costs, at 2–4 (Docket Entry 261)("First

App."). The total amount awarded for these services was $115,040.00.[19]

The second category of services was "Asset Disposition." These services included "assisting the Trustee with the collection, evaluation and analysis of bids received; negotiating the terms and conditions of the proposed sale of assets, determining and accomplishing the abandonment of assets, attendance at the sales themselves, and assistance with the sale s process in general." First App. at 4. The total amount awarded for these services was $3,758.75.[20]

The third category was "Claims Administration and Objections." The title indicates traditional trustee duties, but the time entries reflect accounting work to analyze the First Union loan. This loan was an open line of credit, was the only secured obligation of the debtor and had an outstanding principal balance of about $600,000. The accountants analyzed the loan transactions. The total charge for this category was $15,492.50 of which the loan analysis was the principal task. The end result was an agreed payoff with a small credit to the estate.

The fifth category of services was "Accounting and Auditing." While these services are usually within the province of an accountant, the services rendered to this estate included some services for maintaining the trustee's standard reports of receipts and disbursements. While this may be justified in some circumstances, it must be closely scrutinized. The required records are usually maintained by the trustee's staff, typically a secretary or bookkeeper. Just as an attorney's secretarial and bookkeeping expenses are overhead items not separately charged to clients, the trustee's staff is also an overhead item not normally separately chargeable to the bankruptcy estate. Like attorneys, the profitability of a trustee's operation depends on his skill in managing his costs and generating revenue, that is effecting recoveries for the bankruptcy estate.

The difficulty in allowing accountants to maintain trustees' required records is in large part cost related. Secretarial and bookkeeping salaries are typically between $15 and $30 per hour. Here, the accountant's staff charged the estate between $175 and $200 per hour. The work is primarily clerical—key entry of the data—but does require knowledge of the forms and certain procedures. To the extent that a large case requires extra supervision to maintain correct and consistent entries, the services of an accountant may be appropriate; however, even in these circumstances, it is not appropriate to substitute the accountant's staff for the original key entry function. To complicate matters more in this case, in addition to the required reports, the trustee also maintained reports for the operations of

19. Time entries for Dean G. Popps reflect that he was managing the receivables center. For example, the entry for April 6, 2001, states, "Meeting/working all day at Receivables Center, which I manage." The entry was a single entry for 8.0 hours. The following day reflected the same description together with a meeting with a principal of the accounting firm concerning a trip to Los Angeles. The total time was 3.5 hours.

20. Time entries included "Conference call with [prospective purchaser's] CEO to respond to purchase letter offer."; "Discussions with [prospective purchaser] regarding the potential purchaser of CLC schools."; and "Meeting with Trustee and representatives of CLC to discuss sale of schools and other assets and other steps required for the preservation of corporate assets." First App., Asset Disposition entries for February 1, 2001 and February 4, 2001. These are all traditional trustee functions. The accountant did prepare a present value analysis of a lease. This analysis is appropriately done by an accountant.

the two segments of the business that he was authorized to operate. The reports were necessary so that proper operational reports—which are not included in the trustee software—could be maintained for oversight purposes and tax return preparation purposes. Some of these functions were included in the category entitled "Business Analysis."

The category "Data Analysis" included traditional accountant functions such as "construction, maintenance and reporting of significant case financial data." But, it also included significant information technology services, such as supporting and maintaining the debtors website, reformatting hard drives and removing partitions on hard-drives to preserve privacy and confidentiality of information on computers sold by the trustee. The accountant also "assisted the Trustee in addressing the numerous information systems difficulties experienced on a day-to-day basis." First App. 8–10. The cost for all Data Analysis services was $32,168.75.

The categories in the second application are different from those in the first application. The new categories are: "Accounts Receivable (Installment Sale Retail Notes) Collection"; "Records Retention"; "General Ledgers"; "Technology"; "Tax Issues"; and "Fee Applications." The Accounts Receivable category involved collection of student loans. The accountants assisted the trustee in reopening the collection center, rehiring staff from CLC to operate the center and established a financial control system. During the period of the second fee application, the accountants "provided the daily supervision of the Receivables Center's cash and credit card receivables, as well as supervision of the work hours and payroll entries." Sec.App. at 3. The trustee had been authorized to operate the receivables center under 11 U.S.C. § 721 to collect the student loans.

He employed four to five full-time employees with an initial monthly budget of about $85,000. Of the $53,383.75 billed to this category, $46,573.75 was billed by Dean G. Popps for 251.75 hours of work. He held meetings as a part of what he characterized as "supervisory activities." Sec.App. 4/22/01, 4/23/01, 4/24/01, 4/26/01, 4/27/01, He reported meetings at which "various daily issues" were discussed. Sec.App. 5/23/01, 6/1/01, 6/7/01, 6/8/01, 6/12/01, 6/15/01, 6/20/01. He met with the supervisor of the receivables center hired by the trustee pursuant to his § 721 operations order, the trustee, lawyers in the trustee's law firm and other accountants. The inescapable sense from the time records is that Popps was, in effect, the trustee's intermediary supervising the receivables center for him. These activities are well within the traditional duties of a trustee.

Popps was also instrumental in the records retention facility which the trustee was authorized to operate under § 721. He principally effected the move from the debtor's headquarters to a new facility. The accountants billed $33,531.25 to this category of which Popps accounted for $19,286.25, another 104.25 hours. Overall, the second application requested $221,530.00 of which Popps billed $68,126.25.

The third and fourth fee applications followed the same categories as the second application. They requested $11,888.75 and $39,046.25, respectively. The fifth application changed the categories to "Accounting/Auditing"; "Assisting Court Appointed Professionals"; "Data Analysis and Technology"; and "Tax Issues". It requested $61,305.50. Popps was employed directly by the trustee as of August 1, 2001, at the rate of $10,000 per month on a full-time basis. During the six-month

period ending on July 31, 2001, he billed, on behalf of the accounting firm, $110,260.00 for 596.00 hours of work.

After having carefully reviewed the fee applications together with the supporting time records and the papers filed in this case, the court finds that the accountant's services should be allocated as follows: [21]

### Fee Application Analysis

| | Fees Requested | Within Scope of Employment | Within Retroactive Scope | Trustee Duties | Not Compensable |
|---|---|---|---|---|---|
| **Asset Analysis** | | | | | |
| 1st Application | $115,040.00 | $ 35,267.50 | $ 36,935.50 | $42,837.00 | $ 0.00 |
| **Asset Disposition** | | | | | |
| 1st Application | $ 3,758.75 | $ 1,012.50 | $ 0.00 | $ 2,746.25 | $ 0.00 |
| **Claims Admin.** | | | | | |
| 1st Application | $ 15,492.50 | $ 14,377.50 | $ 0.00 | $ 1,115.00 | $ 0.00 |
| **Employee Benefits & Pensions** | | | | | |
| 1st Application | $ 4,201.25 | $ 1,518.75 | $ 0.00 | $ 2,682.50 | $ 0.00 |
| **Accounting/Audit** | | | | | |
| 1st Application | $ 14,450.75 | $ 14,450.75 | $ 0.00 | $ 0.00 | $ 0.00 |
| 5th Application | $ 47,165.50 | $ 47,165.50 | $ 0.00 | $ 0.00 | $ 0.00 |
| 6th Application | $ 26,832.50 | $ 25,628.50 | $ 0.00 | $ 0.00 | $ 0.00 |
| **Business Analysis** | | | | | |
| 1st Application | $ 787.50 | $ 787.50 | $ 0.00 | $ 0.00 | $ 0.00 |
| **Data Analysis & Technology** | | | | | |
| 1st Application | $ 32,168.75 | $ 0.00 | $ 31,293.75 | $ 875.00 | $ 0.00 |
| 2nd Application | $ 43,181.25 | $ 0.00 | $ 41,781.25 | $ 1,400.00 | $ 0.00 |
| 3rd Application | $ 4,725.00 | $ 700.00 | $ 2,625.00 | $ 1,400.00 | $ 0.00 |
| 4th Application | $ 5,687.50 | $ 525.00 | $ 5,162.50 | $ 0.00 | $ 0.00 |
| 5th Application | $ 2,625.00 | $ 0.00 | $ 2,625.00 | $ 0.00 | $ 0:00 |
| 6th Application | $ 6,352.50 | $ 6,352.50 | $ 0.00 | $ 0.00 | $ 0.00 |
| **Litigation Consult.** | | | | | |
| 1st Application | $ 13,045.00 | $ 13,045.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| **Reconstruction Accounting** | | | | | |
| 1st Application | $ 3,856.25 | $ 2,400.00 | $ 1,456.25 | $ 0.00 | $ 0.00 |
| **A/R Collection** | | | | | |
| 2nd Application | $ 53,483.75 | $ 0.00 | $ 25,000.00 | $28,483.75 | $ 0.00 |
| 3rd Application | $ 393.75 | $ 0.00 | $ 0.00 | $ 393.75 | $ 0.00 |
| 4th Application | $ 2,700.00 | $ 0.00 | $ 0.00 | $ 2,700.00 | $ 0.00 |

Records Retention

21. These amounts are the amounts requested. The amount actually awarded will be adjusted as discussed below.

| | | | | | |
|---|---|---|---|---|---|
| 2nd Application | $ 33,531.25 | $ 0.00 | $ 25,807.50 | $ 7,723.75 | $ 0.00 |
| 3rd Application | $ 337.50 | $ 0.00 | $ 0.00 | $ 337.50 | $ 0.00 |
| **General Ledgers** | | | | | |
| 2nd Application | $ 61,948.75 | $ 58,410.00 | $ 3,010.00 | $ 528.75 | $ 0.00 |
| 3rd Application | $ 4,090.00 | $ 4,090.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| 4th Application | $ 9,038.75 | $ 9,038.75 | $ 0.00 | $ 0.00 | $ 0.00 |
| **Tax Issues** | | | | | |
| 1st Application | $ 7,655.00 | $ 7,655.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| 2nd Application | $ 21,013.75 | $ 21,013.75 | $ 0.00 | $ 0.00 | $ 0.00 |
| 3rd Application | $ 767.50 | $ 767.50 | $ 0.00 | $ 0.00 | $ 0.00 |
| 4th Application | $ 14,581.25 | $ 14,581.25 | $ 0.00 | $ 0.00 | $ 0.00 |
| 5th Application | $ 8,757.50 | $ 8,757.50 | $ 0.00 | $ 0.00 | $ 0.00 |
| 6th Application | $ 35,971.75 | $ 34,798.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| **Fee Application** | | | | | |
| 2nd Application | $ 8,371.25 | $ 275.00 | $ 0.00 | $ 0.00 | $ 8,096.25 |
| 3rd Application | $ 1,575.00 | $ 250.00 | $ 0.00 | $ 0.00 | $ 1,325.00 |
| 4th Application | $ 225.00 | $ 225.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| 5th Application | $ 2,757.50 | $ 250.00 | $ 0.00 | $ 0.00 | $ 2,507.50 |
| 6th Application [22] | $ 37,261.50 | $ 500.00 | $ 0.00 | $ 0.00 | $36,761.50 |
| **Pension Plan Audit** | | | | | |
| 4th Application | $ 6,813.75 | $ 6,813.75 | $ 0.00 | $ 0.00 | $ 0.00 |
| 6th Application | $ 23,291.00 | $ 25,592.50 | $ 0.00 | $ 0.00 | $ 754.50 |
| Total | $676,237.00 | $356,249.00 | $175,696.75 | $93,223.75 | $49,444.75 |

### E. Failure to Disclose Dual Rates

 Frank & Company has a dual fee rate for its clients. It charges one hourly rate for accounting work and another, higher rate, for business consultation work. However, only one rate is applied to an engagement—either the accounting rate or the business consultation rate. The rate used depends on how the firm characterizes the engagement. This was not disclosed in the employment application or any of the first five fee applications. The employment application did not list hourly rates. It only stated that "[c]ompensation will be based upon an hourly fee for actual services performed." Employment App. ¶ 7 (Docket Entry 8). The first fee application listed the professionals who provided services and "the hourly rates charged by each during the Interim Period." First App. at 11. There was no disclosure that there were two hourly rates, one for accounting work and another for business consultation work. There was no disclosure that the accounting firm's standard practice was to determine the predominant nature of the engagement—either accounting or business consultation—and charge the rate associated with the predominant services performed for all services rendered. There was no disclosure that the firm determined the engagement to be predominately business consultation and unilaterally charged the higher business consultation rate.

The dual rate structure was reported by Miller, the court-appointed expert. He discovered, and reported to the court, the two rates and determined that on a firm-wide basis, the difference was 19% overall;

**22.** This includes Category 2, Assisting Court Appointed Professionals; Category 3, Bankruptcy Litigation, which was really fee application matters; Category 4, Fee Application; and $225 from Category 5, Employee Benefits/Pensions, which was miscategorized.

that is, the business consultation rates resulted in a 19% higher bill than if the accounting rate had been used. In this case, if the lower accounting rate should have been used, the estate could be overcharged by more than $142,000 for the first five fee applications.

██ Miller's report concludes that Frank & Company followed the guidance given by the American Institute of Certified Public Accountants. He states:

> Frank & Company treated the Computer Learning Centers (CLC) matter as a consulting service engagement based on guidance approved by the American Institute of Certified Public Accountants (AICPA). Specifically Frank & Company relied on the fact that the AICPA states that bankruptcy engagements undertaken by accounting firms should be treated as consulting engagements. The AICPA's publication, *Providing Bankruptcy and Reorganization Services: A Nonauthoritative Guide* (*"Bankruptcy Guide"*), provides guidance for CPAs with regard to their "role and assignments in bankruptcy matters in the context of litigation services." The *Bankruptcy Guide* states in relevant part:
>
> > Litigation and dispute resolution services are provided by a CPA using accounting and consulting skills to assist a client in a matter that involves a pending or potential formal legal or regulatory proceeding before a 'trier of fact' (for example, a judge, jury, arbitrator, mediator, or special master) in connection with the resolution of a dispute between two or more parties ... *Litigation services also include services to parties of interest in pending or potential bankruptcy proceedings. Litigation services are classified as transaction services subject to the Statement on Standards for*

> > *Consulting Services (SSCS),* and are subject to the SSCS, as well as to the professional standards embodied in the AICPA Code of Professional Conduct.

> In addition, the definition of "consulting services" in the AICPA's Statement on Standards for Consulting Services ("SSCS") states:

> > Consulting services differ fundamentally from the CPA's function of attesting to the assertions of other parties. In an attest service, the practitioner expresses a conclusion about the reliability of a written assertion that is the responsibility of another party, the asserter. In a consulting service, the practitioner develops the findings, conclusions, and recommendations presented. The nature and scope of work is determined solely by the agreement between the practitioner and the client. Generally, the work is performed only for the use and benefit of the client.

Report at 3–4 (Emphasis in Report). Neither the *Bankruptcy Guide* nor the SSCS was presented to the court. Even if they had been presented and the court reviewed the documents in context, neither is binding on the court. Private associations do not set fees in bankruptcy cases. The allowance of fees is the province of the court. Such guidance, however, is relevant in setting appropriate fees. Congress intended professionals be compensated the same in bankruptcy engagements as in non-bankruptcy engagements. It ended the standard of economy of the estate, a standard that resulted in bankruptcy professionals being inadequately compensated. To the extent that such publications assist in evaluating fair market rates, they are useful and should not be ignored. But, they cannot usurp the court's function and

should not be allowed to set fees higher in bankruptcy proceedings that in non-bankruptcy proceedings, a result that Congress did not intend.

Routine accounting services in a typical chapter 7 case do not fit into the description in the *Bankruptcy Guide* or the definition of "consulting services" in the AICPA's SSCS. The quoted portion in Miller's report indicates that litigation and dispute resolution services envision the use of both accounting and consulting skills. The *Bankruptcy Guide* and the SSCS also indicate that there is a controversy to be resolved and refer to a trier of fact, a "formal legal or regulatory proceeding" and "a dispute between two or more parties." While bankruptcy cases can be contentious, the typical chapter 7 case is not. Typically, it is principally the administration of an estate—the collection of assets, the liquidation of the assets and the distribution of the proceeds to creditors. The accountant typically prepares tax returns for the estate in a chapter 7 bankruptcy case. He may assist in the maintenance of books and records, if necessary. He may assist the trustee in understanding the financial statement and condition of the debtor. The bulk of a chapter 7 bankruptcy administration is generally not adversarial. Sales of assets, for example, require court approval, but are generally not contested. There is usually only one party actively involved—the trustee. In short, the typical chapter 7 bankruptcy case does not contain the hallmarks set out in the quote from the *Bankruptcy Guide.*

Nor does the definition of "consulting services" generally indicate that a bankruptcy case is a consultation engagement. The accountant's typical work is relied upon by the trustee and third parties. Creditors rely on the accuracy of the accountant's work and the actual or implied attestations made when an accountant prepares a bankruptcy estate's tax return or financial reports for the trustee's use or for filing with the United States Trustee or the court. The trustee should run the bankruptcy case. They are usually skilled in administering estates and do not normally need to rely on findings, conclusions or recommendations of accountants to administer the estate.

The court cannot agree with the conclusion in the *Bankruptcy Guide* and does not find that the definition of "consulting services" in the SSCS supports that conclusion. Chapter 7 bankruptcy cases cannot automatically be classified as litigation with the result that accountants are automatically justified in charging higher rates. Chapter 7 bankruptcy cases are fundamentally different from general civil litigation. They usually involve multiple parties who are not necessarily adverse to one another. Civil litigation generally involves a plaintiff and a defendant who are adverse to each other. Trustee work in bankruptcy cases generally involves administration, not litigation. The accountant's role in a chapter 7 bankruptcy administration is usually within the confines of traditional accounting.

It is true that an accountant can become very involved in a bankruptcy case, especially a chapter 11 reorganization. There the case may well have a greater similarity to civil litigation than the administration of a chapter 7 estate. The debtor is at odds with his creditors. Matters need to be resolved between them. Sophisticated (and sometimes basic and uncomplicated) plans need to be developed and supported. The court is frequently called upon to resolve multiple issues in the course of the reorganization, many involving sophisticated management and financial matters. Accountants may well be witnesses and supply litigation support. Many debtors seeking reorganization need outside advice

and recommendations which are typically presented to the debtor for the debtor's use in formulating a plan and seeking confirmation of it. That is not this case.

This case is a chapter 7 administration. There has been virtually no litigation. There was only one secured creditor and it was paid in full early in the case. The principal assets—the schools—were sold very early in the case. The basic matter that remains is the distribution to creditors. This is fairly standard fare. It is true that there are a lot of claims to process, but other than the magnitude of the job, it is fairly routine. There are the usual additional matters. For example, the accountant's scope of employment was recently enlarged to include assisting the trustee in evaluating potential preference actions. There is one significant adversary proceeding pending. But, this case— although larger than most—is a basic bankruptcy administration. It is far more in the nature of administration than in the nature of litigation.

In reviewing the nature of the case, the actions taken to date and the actions reasonably likely to become necessary, the court cannot conclude that the predominant nature of this case is business consultation rather than traditional accounting. While there are undertakings where the skills of a business consultant are helpful, they do not predominate.[23]

The failure of the accountant to disclose the dual rates deprived the court of evaluating this matter at the beginning of the employment. The ruling will result in lower rates than the accountant initially expected.[24] The expectation was not justified and arose solely from the accountant's failure to satisfy his obligation of full disclosure. If the court applied Frank & Company's own rule of charging the rate for the type of services that predominate in the engagement, the lower accountant rate would be applied to all services rendered. Just as this rule if applied by the accountant would have resulted in a windfall to the accountant, if applied against the account it would result in a windfall to the estate. The court will apply the accountant hourly rates to the accounting services and the business consultation rates to the business consultation services.[25] Professionals should be paid what their services are worth, no more and no less.

### F. Minimum Billing Units

▆▆▆▆▆ The accounting firm used a minimum billing unit of one-quarter of an hour rather than the required one-tenth of an hour.[26] *In re Temple Retirement Com-*

23. Even if the business consultation services did predominate, the court would not accept the AICPA's position that all fees charged should therefore be at the higher rate. That is especially true here where a substantial amount of the effort was traditional accounting services. To accept the AICPA's position would result in a significant windfall to the accountant at the expense of the creditors.

24. Miller opined that the accountant's fees were reasonable, but his opinion was based on reviewing accountant's fees in light of the AICPA's *Bankruptcy Guidelines* not the application of bankruptcy principles. Had this case been more in the nature of litigation, such as a complex chapter 11 reorganization, the court would have given his opinion greater weight.

25. The discovery of the dual rate structure was made after the accountant's first fee application was approved. The interim fees previously awarded will be reduced by $18,505.90 to adjust for the application of the proper rates. This adjustment is reflected in the order entered today.

26. The United States Trustee's Guidelines for Reviewing Applications for Compensation issued on January 30, 1996, provides for contemporaneous time records in time periods of tenths of an hour. *Guidelines,* § II.D.5.

*munity, Inc.,* 97 B.R. 333, 339 (Bankr. W.D.Tex.1989). Compensation is limited to the actual, necessary services rendered by the professional. 11 U.S.C. § 330(a)(1). While there needs to be a minimum billing unit, the unit chosen must reasonably and accurately reflect the actual time expended. *See In re Corporacion de Servicios Medico–Hospitalarios de Fajardo, Inc.,* 155 B.R. 1, 2 (Bankr.D.Puerto Rico 1993). A quarter-hour unit generally overstates the actual time expended in a bankruptcy case. *In re Bass,* 227 B.R. 103, 107 (Bankr.E.D.Mich.1998); *In re Stoecker,* 114 B.R. 965, 976 (Bankr.N.D.Ill.1990); *In re Wildman,* 72 B.R. 700, 726 (Bankr. N.D.Ill.1987).

The extent of the overstatement can be seen in the following example. If a time-keeper billed a quarter-hour minimum unit service and had an hourly rate of $200, he would bill a total of $50. On the other hand, assuming that the actual time is randomly distributed over the quarter-hour minimum billing unit, the bill, if billed in tenth-of-an-hour minimum units, would be $36 for the same services.[27] The quarter-hour minimum unit for the first quarter hour overstates the charge by $14, a 38.89% overstatement from a tenth-hour minimum billing unit. The overstatement is reduced as the time entry increases. If a 1.25–hour entry is billed with .25 hour minimum billing increments, the overstatement is 5.93% applying the same analysis.

This is so because it is only the last minimum billing increment that is involved. Under either system, the first hour would necessarily be billed in full. With a .25 hour minimum billing increment and a $200 per hour rate, the charge in this example would be $250. With a 0.1 hour minimum billing increment, the charge would be $220, $240 or $260 reflecting time of 1.1 hours, 1.2 hours or 1.3 hours. Similarly, a time entry of 4.25 hours overstates the actual time expended by 1.67% if the actual time is randomly distributed from 4.00 hours to 4.25 hours.

The actual time expended in a case is not randomly distributed over all time intervals. The actual time expended depends on the services rendered. Different types of services typically take different amounts of time. However, in most bankruptcy cases, the most frequent time intervals recorded are from 0.1 hours to 1.0 hours. Within this time interval, one-, two-, and three-tenths of hours typically predominate. These are typically communication-type entries: telephone calls, discussions, e-mail and short letters. *See In re Tom Carter Enterprises, Inc.,* 55 B.R. 548, 549 (Bankr.C.D.Cal.1985). Written work, especially preparation of nonroutine motions and memoranda, is more typically measured in hours. Here, the accountant's time records reflect a similar distribution, although there are longer time increments than in a typical application.[28]

---

**27.** A service charged at .25 hour, if the minimum billing unit is .25 hour, would be billed as 0.1, 0.2 or 0.3 hours if the minimum billing unit were 0.1 hour resulting in a bill of $20, $40 or $60, respectively. On a random basis, it is likely that a 0.1 hour charge would be made in 6 out of 15 times (40%), a 0.2 hour charge in 6 out of 15 times (40%) and a 0.3 charge in 3 out of 15 times (20%) for any .25 hour charge. (The .25 hour charge consists of 15 minutes. Each tenth of an hour consists of 6 minutes.) Applying the mathematics, 0.1 hour times 40% times $200 per hour (that is, $8) plus 0.2 hour times 40% times $200 per hour (that is, $16) plus 0.3 hour times 20% times $200 per hour (that is, $12) equals $36.

**28.** The time records appended to the Second Application (Amended)(Docket Entry 414) reflect 22% of the time entries are over four hours. Most of these are for Dean Popps and are full hours. Twenty-two are for either 8.0 or 8.25 hours and 12 are for increments in excess of 8.50 hours. This is exceptional, even for accountants.

However, about 78% of Frank & Company's hours are less than four hours,[29] 58% are less than two hours and 41% are less than one hour. There are about 178 time entries of one hour or less. Of these, about 29% are for one-quarter of an hour; 33%, half an hour; 13%, three-quarters of an hour; and 25%, one hour, a relatively even distribution over the time increment.

■ The burden is on the applicant to maintain and present proper time records. Where the applicant does not fulfill this responsibility, the fee application can be denied in full. That is, however, an unnecessarily harsh penalty when a reasonable estimate of the actual time can be made. Here, the distribution of the time increments shows that 41% are of one hour or less. The greatest overstatement of time occurs in these time increments and ranges from 38.89% at .25 hours to 5.93% at 1.25 hours with lesser overstatements at larger intervals, although there is no quarter-hour time increment for which there is no average overstatement.[30] An overall five percent reduction most closely approximates the overstatement in this case by the use of quarter-hour increments rather than tenth-hour increments. In other cases, the overstatement may be different. *In re Price*, 143 B.R. 190, 194–95 (Bankr. N.D.Ill.1992)(5% reduction); *In re Matis*, 73 B.R. 228, 234 (Bankr.N.D.N.Y. 1987)(6.5% reduction) The allowed fees from the second through the fifth fee applications will be reduced by five percent. The accountant used tenth-of-hour units in its sixth application.

## G. Fee Applications Expenses

■ There are two issues with respect to allowing additional fees in connection with fee applications. One is whether additional fees may be awarded for preparing the fee application itself. The other is whether additional fees may be awarded for presenting the fee application to the court or for prosecuting or defending it. Section 330(a)(6) provides that "Any compensation awarded for the preparation of a fee application will be based on the level and skill reasonably required to prepare the application." While § 330(a)(6) does not itself mandate compensation for the preparation of fee applications, it furthers the Congressional intention expressed in 1978 when the Bankruptcy Code was enacted of placing bankruptcy professionals' compensation on the same level as non-bankruptcy compensation. To the extent that extra administrative effort is required to comply with the compensation provisions of the Bankruptcy Code or the Bankruptcy Rules, professionals are not compensated at the same level unless an allowance is made for the additional work.

■ This does not mean that every aspect of preparing a fee application is compensable. *In re CF & I Fabricators of Utah, Inc.*, 131 B.R. 474, 483–88 (Bankr. D.Utah 1991) carefully reviews the billing process and analyzes each aspect for purposes of compensation under 11 U.S.C. § 330. It holds that those portions of the billing process common to billing both bankruptcy clients and non-bankruptcy clients are not compensable under § 330 because they are part of the professional's

---

**29.** The high number of time entries in excess of four hours—many for a full 8–hour working day—is a matter of concern for the court. Longer entries typically suggest "blocking" time, that is, including multiple activities in one longer time entry or the absence of contemporaneous time records. Time entries for extended periods of time are not per se objectionable, but the presence of so many with such abbreviated descriptions is troubling.

**30.** For example, a time interval recorded at 8.0 hours might actually have been 7.8 or 7.9 hours.

overhead. They are not separately charged to non-bankruptcy clients and no additional effort is required to complete them for a bankruptcy client. For example, maintaining time records does not require additional effort. Lawyers and accountants maintain the same time records in non-bankruptcy matters as in bankruptcy matters. *Id.* at 484–85. Nor do lawyers or accountants charge for preparing their bills. Bills must be prepared in non-bankruptcy matters as well as bankruptcy matters. *Id.* at 485–87. *See also In re Junco, Inc.,* 185 B.R. 215 (Bankr.E.D.Va.1995)(Shelley, J.). There may be some additional effort in putting the time records into the format required by the court. For example, the court requires time records to be maintained chronologically by task. While this may sometimes differ from the format of a non-bankruptcy bill, the additional effort is not generally significant if the records are initially properly set-up. Time records are almost universally maintained on computers with software that allows multiple formats, one of which will usually satisfy bankruptcy requirements. "A computer billing package used by a professional that does not retrieve information in a format compatible with bankruptcy requirements and requires revisions to rectify the inadequacies, is not a deficiency the estate should pay for." *Id.* at 486. This is especially true for professionals who regularly practice in this court and regularly prepare fee applications. Only those aspects of preparing a bankruptcy fee application that require additional—not merely different—efforts are compensable under § 330(a)(6).

The 1994 amendments to § 330(a) do not address the question of additional fees for either presenting the fee application to the court or for prosecuting or defending it. Section 330(a)(6) speaks only of "preparation" of the fee application. "The litigation of a fee dispute is an exercise to be distinguished from preparation of the underlying fee application." *In re St. Rita's Assoc. Private Placement, L.P.,* 260 B.R. 650, 652 (Bankr.W.D.N.Y.2001). Bankruptcy courts are, however, increasingly allowing additional compensation for successfully defending fee applications. *In re Nucorp Energy, Inc.,* 764 F.2d 655 (9th Cir.1985) as explained in *In re Riverside–Linden Investment Co.,* 945 F.2d 320 (9th Cir. 1991) is illustrative. *Nucorp* allowed fees for preparing and presenting an unopposed fee application. However, in *Riverside–Linden Inv. Co.,* fees incurred in unsuccessfully defending a fee application were not allowed. The Court of Appeals stated:

> We agree with the BAP that '*Nucorp* does not provide a blanket allowance of fees for any and all services related to the fee application.' 11 B.R. at 301. As the BAP reasoned, permitting fees in this situation
>
>> could encourage attorneys to assert meritless fee requests. Regardless of whether or not they were awarded the requested fees, the attorneys could recover fees incurred in opposing objection to the meritless requests. Such a result is not contemplated by *Nucorp. Id.* at 302.

*Riverside–Linden Inv. Co.,* 320 at 323.

A second line of cases allowing additional fees for defending a fee application is premised on a different rationale. They look to other federal statutes allowing fee awards. *Nunley v. Jessee,* 92 B.R. 152 (W.D.Va.1988) is an example. In *Nunley,* the district court held that additional attorney's fees for successfully defending the original fee application were not per se prohibited. The district court found that there should be no difference in fee applications arising under the Bankruptcy Code

and fee applications arising under other federal statutes, such as civil rights and antitrust statutes. In those cases, counsel may be awarded additional fees to defend their fee applications. *Id.* at 153. *See e.g. Young v. Kenley,* 641 F.2d 192, 195 (4th Cir.1981) (holding relating to what constitutes a prevailing party abrogated in *Smyth ex. rel. Smyth v. Rivero,* 282 F.3d 268 (4th Cir.2002) in light of *Buckhannon Bd. and Care Home, Inc., v. West Virginia Dept. of Health,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001)); *Knighton v. Watkins,* 616 F.2d 795, 800 (5th Cir.1980); *Bagby v. Beal,* 606 F.2d 411, 415–16 (3d Cir.1979); *Gagne v. Maher,* 594 F.2d 336, 343–44 (2nd Cir.1979).

The examination of other federal statutes allowing fee awards is important. The Supreme Court has cautioned that, with certain limited exceptions, the American Rule prevails in federal court, that is, each party bears his own attorney's fees and expenses. *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 247, 95 S.Ct. 1612, 1616, 44 L.Ed.2d 141 (1975). This was recently again emphasized by the Supreme Court in *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources,* 532 U.S. 598, 121 S.Ct. 1835, 149 L.Ed.2d 855 (2001). *Buckhannon* was decided under the Fair Housing Amendments Act and Americans with Disabilities Act which have prevailing party standards. The Court narrowly construed the term "prevailing party" in these fee shifting statutes and held that an award of attorney's fees was not permitted in the circumstances of the case. It reaffirmed and emphasized *Alyeska* by repeating what it had written in *Alyeska:* "Nor has [Congress] extended any roving authority to the Judiciary to allow counsel fees as costs or otherwise whenever the courts might deem them warranted." *Buckhannon,* 532

U.S. at 610, 121 S.Ct. at 1843, quoting *Alyeska,* 421 U.S. at 260, 95 S.Ct. at 1612.

It does not automatically follow from the fact that attorney's fees are awarded under a federal statute that the costs of presenting or defending a fee application are also recoverable. There are two types of awards—those in which the prevailing party's fees are paid by the losing party and those in which the prevailing party's fees are paid from the recovery, often a common fund. *Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1825, 152 L.Ed.2d 996 (2002); *Prandini v. National Tea Co.,* 585 F.2d 47 (3d Cir.1978)(fees allowed for defending fee application in employment discrimination case under 42 U.S.C. § 2000e–5(k) and distinguishing denial of such fees in *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.,* 540 F.2d 102 (3rd Cir.1976), a common fund case). Fee shifting is provided for in many federal statutes, for example, under the Civil Rights Attorney's Fees Awards Act of 1976 in 42 U.S.C. § 1988(b) and under the Equal Access to Justice Act in 28 U.S.C. § 2412(d)(1)(A). Other federal statutes, however, only permit or regulate fee awards from the amount recovered. The Social Security Act in 42 U.S.C. § 406(b), the Federal Tort Clams Act in 28 U.S.C. § 2678 and the Veterans' Benefits Act in 38 U.S.C. § 5904(d)(1) are examples. In the fee shifting statutes, the costs of defending a fee application are generally allowable. The central idea is that the award of costs and fees is a cost of litigation and without an award for defending a fee application, the prevailing party is not made whole. Where, however, the fees awarded are not paid by the losing party but are paid from the recovery, a different rule prevails.

The basis for a recovery from a common fund is different. The central idea is that

all the parties who are benefitted by the recovery should contribute to the fees incurred in obtaining the recovery. *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 119 (3d Cir.1976)(private antitrust suit). The costs of defending a fee application, however, do no benefit any of the parties with an interest in the common fund. The common fund is not increased by the fee application process or litigation over fee applications. In fact, the funds available for distribution to the fund beneficiaries would be diminished if the additional costs were allowed. *Id.* at 110–11.

The Bankruptcy Code compensation provisions should be examined in light of this background. *St. Rita's Assoc. Private Placement* addressed the issue of additional compensation for defending a bankruptcy fee application. The litigation on the original fee application was "highly controverted" and resulted in a reduction in fees from the $99,868.49 requested to $86,102.49. *Id.* at 650. Counsel then filed a second application seeking an additional $13,405.87 for defending its original fee application. The court construed § 330 as a whole. It considered § 330(a)(6) in light of § 330(a)(3)(E) which states that one factor to be considered in awarding compensation is "whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under [Title 11]." Both provisions were part of the 1994 amendments to the Bankruptcy Code. The court stated that outside bankruptcy, an attorney faced with a client who refuses to pay a bill

must choose either to 'write-off' the liability or to commence litigation for collection. In that litigation, the 'American rule' applies. Each side generally assumes the cost of its own legal counsel. Because skilled practitioners outside bankruptcy would customarily receive no compensation for the additional time spent on litigating a fee dispute, no further compensation is payable to [counsel].

*St. Rita's Assoc. Private Placement,* 260 B.R. at 652. Thus, the absence of clear authority to award attorney's fees resulted in the application of the American Rule, that is, each party paid its own expenses.[31]

It is clear that professionals are to be awarded their fees for bankruptcy services from the bankruptcy estate. What is not clear is the outer limits of fee awards, particularly, whether the costs of presenting and prosecuting or defending a fee application are also recoverable. The statutory basis is not entirely clear. Congress could have resolved the issue with its 1994 amendments to § 330 by expressly expanding the scope of § 330(a)(6) to include such fees rather than referring only to "preparation of a fee application" and the skill reasonably required to "prepare the application." The addition of § 330(a)(6) was intended to clarify the types of fees allowable. Consequently, the absence of additional language could have been intended as limiting the fees allowable. However, Congress has clearly stated that professionals should be compensated the same for bankruptcy work as for non-bankruptcy work. 11 U.S.C. § 330(a)(3)(E).

---

**31.** *St. Rita's* also considered another basis for the award of fees, the absence of good faith by the objector. However, the objector succeeded in reducing the requested fees by about 14% and the court found that the objections had been filed in good faith. There was, therefore, no other independent basis for counsel fees. *See Alyeska,* 421 U.S. at 257–258, 95 S.Ct. at 1621–22 (willful disobedience of a court order, bad faith and common fund exceptions to American Rule).

Bankruptcy cases and § 330(a) do not neatly fit in the molds of other fee shifting statutes or common fund fee awards. They have characteristics in common with both and in conflict with both. Like fee shifting statutes, § 330(a) does not expressly refer to additional fees for defending a fee application. However, fee shifting statutes are generally construed to provide for such fees so that the professionals are fully compensated for their services, the clear intention of Congress for professionals in bankruptcy cases. Like common fund fee awards, fees are not actually shifted from one party to another in a bankruptcy case. The fees are paid by the bankruptcy estate, rather than a losing party. The bankruptcy estate is analogous to a common fund and shares the characteristic that no additional funds are created by the fee application process. Rather than merely shifting fees between the parties to the litigation the bankruptcy estate is diminished by any award. However, the trustee is appointed by the United States Trustee, not retained by a private party, and is paid by the estate for his services. The trustee's professionals are retained only with the approval of the court and are also paid by the estate for their services.

Just as it is not clear that the 1994 amendments were intended to mandate additional fees for presenting, prosecuting or defending fee applications, the amendments do not clearly preclude the award of additional fees for successfully defending a fee application. There is no comparable language in § 330 the restricts fee awards as is found in the Social Security Act, the Federal Tort Clams Act or the Veterans' Benefits Act. However, the bankruptcy fee application process can entail additional effort by the professional before he may be paid. In non-bankruptcy cases where there is no statute shifting fees to the prevailing party, third-party approval of a professional's bill is not required. Resort to court is necessary only if the client refuses to pay the bill presented. In bankruptcy cases, a court order is necessary *before* the professional may be paid. This procedure allows all interested parties in the bankruptcy case—that is, the creditors who are in reality paying the bill—to review the bill and raise appropriate objections. This additional step may impose little additional expense on the applicant. In fact, while some fee applications generate questions from creditors, the United States Trustee or the court, most are unopposed. This part of the process is analogous in a non-bankruptcy matter to reviewing a bill with a client, answering the client's questions and addressing the client's concerns. It is not an activity for which attorneys or accountants charge. See *In re Junco, Inc.*, 185 B.R. at 220. Professionals have a responsibility to explain their bills to their clients. *See e.g.* Virginia Rules of Professional Conduct, Rule 1.5(b) ("The lawyer's fee shall be adequately explained to the client.") These routine questions are not usually time-intensive and should generally not be included in fee applications.

The fee application process can become involved and expensive, particularly if the fee application process is improperly used to seek an unjustified reduction in fees. If additional fees for defending fee applications are invariably denied, objections may be encouraged on the theory that what is not objected to will not be disallowed. *In re American Preferred Prescription, Inc.*, 218 B.R. 680 (Bankr.E.D.N.Y.1998).

Automatic allowance of additional attorney's fees may encourage applicants not to exercise sufficient care in preparing fee applications or not to apply appropriate billing discretion on the theory that what is not requested may not be allowed. If they ask for too much, there is no detri-

ment because they will invariably be awarded additional fees for defending their initial position. It endorses a lax, less professional approach to fee applications.

Good faith and professionalism should be encouraged in the fee application process and the impact of the allowance or denial of additional fees for defending a fee application should be minimized. These objectives as well as the Congressional objective of compensating professionals the same whether they are engaged in a bankruptcy case or in a non-bankruptcy matter are furthered by allowing additional fees to successfully present, prosecute or defend a fee application in appropriate circumstances. Factors that may be taken into account in deciding whether to award additional fees for defending a fee application are whether the application was accurate and complete, whether the application complied with all applicable standards, whether the objections were made in good faith, the extent of additional work reasonably necessary under the circumstances and the extent to which the requested fees were awarded. The last factor has elements similar to those found in a prevailing party standard, however, it should be remembered that most objections to fee applications object to only portions of the fee application. Consequently, it cannot be said that an applicant has prevailed if he is awarded 95% percent of the fees requested if the objection was solely to the remaining 5% and was sustained.

In this case, the accountants request[32] $8,371.25 for preparation of fee applications in its second fee application; $1,575.00 in its third fee application; $225.00 in its fourth fee application; $2,757.50 in its fifth application; and $36,997.50 in its sixth fee application.[33] The accountants also requested reimbursement of $61,793.24 as expenses in their sixth fee application for legal fees incurred in connection with their fee applications. They retained Holland & Knight to represent them in obtaining approval of their fee applications. Holland & Knight did not prepare any of the fee applications. In addition, the trustee's law firm requested compensation for preparing the accounting firm's fee application, appearing in court seeking approval of the fees and seeking to modify the accountant's scope of employment. (Docket Entries 411, 456, 494, 587 and 723).

The accountants prepared their own time records and the trustee's law firm prepared the written fee applications and notices and noticed the hearings on the fee applications. While most of the accountant's time appears to be formatting and editing the time records, some time was expended in assisting the trustee in drafting the fee applications, particularly in describing the narrative of the services rendered. Much of the time expended on the second fee application was that of three senior accountants, all principals of the firm, who billed at the business consultation rate of $225.00 per hour. They accounted for $7,931.25 of $8,371.25. For

---

32. In addition to the category "Fee Applications", the fifth and sixth fee applications also contained a category captioned "Assisting Court Appointed Professionals." It is time the accountants expended to provide Miller, the court-appointed expert, with documentation he requested concerning the accountant's fee applications.

33. The sixth fee application requested $32,857.50 under the category captioned "Assisting Court Appointed Professionals," $780.00 requested under the category captioned "Bankruptcy Litigation," and $3,360.00 under the category captioned "Fee Applications." The Bankruptcy Litigation entries were miscategorized and were for time expended to respond to Miller with respect to Frank & Company's fee applications.

example, one principal had a single, block entry of seven hours described as "Prepare statements and descriptions for fee application; review document; and eliminate duplicate submissions." This is simply excessive and unreasonable particularly considering that this was the second fee application. The format and text of the second fee application differed only modestly from the text of the first fee application. The same form, and substantially the same text, was carried through all the fee applications. The use of senior accountants was unnecessary and exceeded the level and skill reasonably required to prepare the application. 11 U.S.C. § 330(a)(6).

The charge for assisting the court-appointed expert will not be allowed. The burden is on the applicant to show that the applicant is entitled to compensation. In this case, the accountant did not carry this burden, particularly with respect to the appropriate hourly rate. The court appointed an expert to fill this gap in the accountant's proof. The time for which the accountant seeks compensation was not to prepare its fee application, but to provide information to Miller to justify its claimed hourly rate. This is an instance where the costs of obtaining approval of a fee application ought not be allowed.[34] The amounts requested are simply excessive. Most of the work could have been avoided if the accountants had initially made full disclosure of their rate structure and presented sufficient evidence of the reasonableness of their rates and the time expended at the first hearings on the fee applications.

In this case, the additional effort necessary to provide sufficient information to the trustee and his law firm to prepare a proper fee application is $250 per fee application for the second through fifth fee applications and $500 for the sixth fee application, a total of $1,500.00.

 The accountants also seek reimbursement of a $61,793.24 legal bill. They retained Holland & Knight to represent them in connection with obtaining approval of the firm's fee applications. Almost the entire bill was incurred in connection with Miller's review of their fee application. The statutory scheme for payment of professionals from the bankruptcy estate is clear. Section 330(a) permits compensation only of the trustee, an examiner, or a professional employed under § 327. Section 327 provides that the trustee may, with the court's approval, employ professionals to represent or assist the trustee. There is no authority for a professional to employ another professional at the expense of the estate. This is consistent with the non-bankruptcy rule that each party bears his own legal fees and expenses in litigation unless by contract the fees and expenses are shifted to another party. Holland & Knight is a professional and was not employed under § 327. *See Max Rouse & Sons, Inc. v. Specialty Plywood, Inc. (In re Specialty Plywood, Inc.),* 160 B.R. 627, 632 (9th Cir. BAP 1993) opinion withdrawn upon settlement by parties, 166 B.R. 153 (9th Cir. BAP 1994). Consequently, Holland & Knight may not be directly compensated by the estate.

 Frank & Company seeks to characterize the legal fee as an expense. Section 330(a)(1)(B) permits a professional employed under § 327 to be reimbursed

---

**34.** It can only give solace to professionals who have not fully prepared for a fee application hearing and raise the expectation that if they require additional evidence to obtain approval of their fee application, not only will the court compensate an outside expert, but also compensate the professional for providing information the expert needs in order to do the job the professional should have done in the first instance.

for actual, necessary expenses. An expense is necessary if it is required to accomplish the task for which the professional was employed. *In re Mahaffey,* 247 B.R. 823, 825 (Bankr.D.Mont.2000); *In re Grabill Corp.,* 110 B.R. 356, 362 (Bankr. N.D.Ill.1990). *See* 3 Collier on Bankruptcy ¶ 330.05[1] (15th ed.2002). The legal representation commenced after the accounting services were provided and after the fee application was submitted to the court. The legal fees incurred did not relate to the completion of professional services provided by Frank & Company and were not necessary to the completion of any tasks for which Frank & Company was responsible. They were incurred solely to represent Frank & Company with respect to prosecuting its fee applications. They cannot be characterized as expenses for purposes of § 330(a)(1)(B).

▮▮▮ There is another basis upon which the legal fees could be paid by the bankruptcy estate. As discussed above, § 330(a)(6) permits compensation for preparation of fee applications. While these fees were clearly not related to the preparation of the fee applications, there were incurred in justifying the applications. Legal fees for the defense of a fee application can be awarded when appropriate. *In re American Preferred Prescription, Inc.,* is such a case. In that case, the bankruptcy court allowed the reimbursement of legal fees incurred by the accountant employed by the chapter 11 trustee to defend against a disqualification motion filed by the debtor. The debtor which the court noted appeared "ready to litigate every and any issue" sought to disqualify the accounting firm after it had completed the "lion's share of its work." *Id.* at 683, 687. The court found that the motion was "baseless," "frivolous," and "was lacking in any legal or factual basis." *Id.* at 688. After reviewing cases in which awards were made on the doctrine of fundamental fairness, the court stated that, "The com-

mon thread running through these cases and in the case at hand is that the debtor in question has caused an injury to a third party for which the estate must be held responsible." *In re American Preferred Prescription, Inc.,* 218 B.R. at 688. The court ordered the debtor, who had filed the disqualification motion and caused the expenditure, to reimburse the accounting firm its legal expenses.

These are not the circumstances present here. The accounting firm had the burden of proof on its fee application and failed to sustain it. "This burden is not to be taken lightly, as 'every dollar expended on [professional] fees results in a dollar less that is available for distribution to the creditors.'" *In re Chicago Lutheran Hospital Ass'n,* 89 B.R. 719, 732 (Bankr.N.D.Ill. 1988) (quoting *In re Hotel Associates, Inc.,* 15 B.R. 487, 488 (Bankr.E.D.Pa.1981)). The court appointed Miller to review the applications rather than denying them. Miller's review revealed the previously undisclosed dual rate structure of the accounting firm and the hearings ultimately resulted not only in a thorough review of the fee applications but also the clarification of the accountant's scope of employment. Unlike *American Preferred Prescription, Inc.,* the questions raised were not frivolous, the accounting firm did not prevail on them and the legal fees were caused, not by the debtor or a third party, but by the accountant. However articulated, whether it be fundamental fairness, equitable powers under § 105 or a general ability to recover attorney's fees in proper cases, none can be invoked in this case to permit the reimbursement of the accountant's legal fees.

## II. Fee Applications of Trustee and Trustee's Law Firm

### A. Hourly Rates

The starting point for considering the fee applications of the trustee and his law

firm which acted as counsel to him as trustee is the hourly rate applicable for each timekeeper and the trustee. *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891, (1984); *Daly v. Hill,* 790 F.2d 1071 (4th Cir.1986); *Harman v. Levin,* 772 F.2d 1150 (4th Cir.1985); *Ballard v. Schweiker,* 724 F.2d 1094 (4th Cir.1984); *Arnold v. Burger King Corporation,* 719 F.2d 63 (4th Cir.1983); *Barber v. Kimbrell's Inc.,* 577 F.2d 216 (4th Cir.1978); *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir.1974); *In re King,* 88 B.R. 768, 770 (Bankr.E.D.Va. 1988). Congress basically adopted these factors in 11 U.S.C. § 330(a)(3) and (4).

■ A central factor in determining an appropriate award of compensation is "the prevailing market rates in the relevant community". *Blum,* 465 U.S. at 895, 104 S.Ct. at 1547; *Daly,* 790 F.2d at 1077, 1079–81. The prevailing market rate may be more or less than an individual attorney's hourly rate. *In re Narragansett Clothing Co.,* 210 B.R. at 499; *In re S.T.N. Enterprises, Inc.,* 70 B.R. 823, 843 (Bankr. D.Vt.1987). While the individual attorney's hourly rate is a factor to be considered in establishing the prevailing market rate, it is but one datum in the analysis.[35]

■ The trustee has a duty to the bankruptcy estate to retain competent professionals at reasonable rates. The trustee is duty-bound to seek out competent counsel and obtain rates not exceeding the prevailing market rate, even if proposed counsel must reduce his or her regular rates. The test is not the particular attorney's rate, but the prevailing market rate. This is especially important where the trustee employs his own firm. The transaction is not an arm's length transaction. While employment by the trustee of the trustee's own law firm is frequently appropriate and is expressly authorized by § 327(d) of the Bankruptcy Code, employment and compensation must be closely scrutinized.

■ The court is in an excellent position to evaluate the prevailing market rate for attorney's fees by virtue by the innumerable fee applications presented to the court.[36] The very number of applications provides an exceptional view of the breadth and depth of the legal community and the fees charged. The current prevailing rate for experienced bankruptcy practitioners in the community is $265.00.[37] Absent the application of other factors such as those set out in § 330(a) or *Johnson,* bankruptcy counsel should not have an expectation of compensation in excess of $265.00 per hour for attorneys and $70.00 per hour for paraprofessionals. The prevailing rate for less experienced counsel is lower.

■ A word is in order as to what constitutes the "relevant community" for determination of the prevailing rate. The trustee argues that the relevant communi-

---

**35.** This is illustrated by the hourly rates requested over the course of this case. The trustee requested an hourly rate of $295 from the commencement of the case on January 25, 2001, through April 28, 2002. On April 29, 2002, the trustee's seven-attorney firm merged into Wiley, Rein & Fielding LLP, a 225–attorney firm. On May 13, 2002, the trustee sought to employ Wiley, Rein & Fielding, LLP as his counsel. The application stated that the trustee's hourly rate had increased to $425. Employment Application at ¶ 19(c) (Docket Entry 686). Additionally, one of the associate's hourly rate was $185 through October 31, 2001, when it was increased to $225.

**36.** Neither the trustee nor his law firm presented any evidence on this matter.

**37.** Most bankruptcy practitioners also practice in other areas as well. Their rates are the same for both bankruptcy work and non-bankruptcy work.

ty includes Washington, D.C. and not merely Northern Virginia. Legal fees in Washington, D.C. can be significantly higher than its suburb, Northern Virginia. In many jurisdictions, the relevant community will be readily apparent and will be substantially confined to a geographic area. In a large urban and suburban area, however, the practice of law may be much more diverse and robust. In those circumstances, geography may not be as significant a factor. The relevant market consists of those attorneys who regularly practice before the court in a case like the one before the court and perform the services the trustee requires. *Blum*, 465 U.S. at 896 n. 11, 104 S.Ct. at 1547 n. 11 (the prevailing market rate is that rate which is "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."); *Johnson*, 488 F.2d at 718 ("customary fee for similar work in the community.") This case is, for the most part, a straightforward chapter 7 administration. It is certainly larger than most chapter 7 asset cases and does involve more work, but the type of work required of the trustee's law firm is not substantially different in kind than required in most other chapter 7 asset cases administered in this court. *See In re J.W. Knapp Compa-*

*ny*, 930 F.2d at 388 ("[T]he large number of creditors required more administrative work, but did not pose unique or complex legal issues.") The services required of the law firm and the trustee were the assembly of the assets, the sale of the assets, the review and allowance of the claims filed and related matters. There are four aspects of this case that are outside the usual parameters. The four areas were the debtor's pension and benefit plans, educational law matters, securities law matters and one significant adversary proceeding which is pending.[38] In each instance, the trustee retained special counsel. The trustee's law firm performed few services related to these matters. This is the preferred manner in handling matters requiring specialized expertise. Rather than suggesting that the trustee's law firm should be entitled to the higher rate charged by special counsel because of their specialized expertise, it confirms that the trustee's law firm is acting within the usual parameters of a chapter 7 asset case. Specialized expertise is supplied by special counsel who are properly compensated at the prevailing rates for the specialized bar. They constitute a separate market for purposes of determining the appropriate prevailing market rate.[39]

**38.** The adversary proceeding is presently pending in the District Court. Both parties requested a jury trial.

**39.** This suggests that not all counsel who appear in this court will be compensated at the same hourly rate. There is a split of authority on the issue of "local" versus "national" rates. Some courts have held that out-of-town counsel cannot be compensated at rates higher than local counsel. *See, e.g., In re Geofreeze Corp.*, 50 B.R. 200, 202 (Bankr. E.D.Va.1985) (Bostetter, J.); *In re Nova Real Estate Investment Trust*, 25 B.R. 252, 254–55 (Bankr.E.D.Va.1982) (Bostetter, J.). *See also* 3 Collier on Bankruptcy, ¶ 330.04[3][c][ii] (15th ed., 2002). Viewed, as the Supreme Court requires, in terms of "relevant market"

the issue can be easily reconciled. One factor in determining the proper hourly rate is the type of work that is performed and the market within which counsel practices. If a national chapter 11 case were filed in this court that required bankruptcy counsel experienced in large, complex reorganizations, the relevant market for such counsel would be those counsel who regularly represent debtors in large, complex reorganizations throughout the United States. The hourly rates of local counsel who are well experienced in local chapter 11 reorganization cases may not be particularly relevant because they compete in a different market. Their rates would remain their usual "local" rates.

█ The geographic location of an attorney's office is a relevant factor, but not a limiting factor in determining the relevant market. While most attorneys who regularly practice before this court and perform the services the trustee seeks have their principal office in Northern Virginia, some have their principal office or a satellite office in the District of Columbia or Maryland. Similarly, most are members only of the Virginia State Bar and practice exclusively in this court and Virginia state courts; but some are also members of the bars of the District of Columbia or Maryland and also practice in those jurisdictions. Moreover, some bankruptcy attorneys who maintain offices in Northern Virginia rarely appear in this court because they represent "national" clients in other bankruptcy courts, notably Delaware and the Southern District of New York. Thus, the physical location of an attorney's office does not itself determine whether the attorney is within the "relevant market".

Greater weight should be given to the actual practice of the members of the bankruptcy bar. Practices, even in this court, differ widely. Some practices are effectively limited to typical consumer cases; others include or are limited to commercial cases or complex chapter 11 reorganizations. To determine the prevailing market, the court needs to identify those counsel who regularly appear in cases like the present case, that is, business and consumer chapter 7 cases. Greater weight is given to their rates in determining the prevailing market rate than bankruptcy practitioners who may have offices in this locality but do not regularly appear in this court in consumer or business chapter 7 cases.

The most experienced practitioners are well versed in chapter 7 and chapter 13 practice and also generally have significant chapter 11 experience. They are knowledgeable and have represented clients in proceedings under chapters 7, 11 and 13. They are experienced in the wide range of matters that come before the court and have been involved in many of them. Among the trustees, their usual counsel and the bankruptcy bar, there is an ample number of counsel available who regularly appear before the court to represent trustees, or are fully qualified to represent trustees. The prevailing rate of the most experienced attorneys is $265 per hour in both bankruptcy and non-bankruptcy cases.

█ The trustee's compensation will also be calculated on an hourly basis. Like all other professionals, the trustee's compensation is governed by § 330 of the Bankruptcy Code. Unlike other professionals, his compensation is capped by § 326 of the Bankruptcy Code which is itself a sliding scale based on the distribution to creditors. The text of § 326(a) is itself instructive. It states:

> In a case under chapter 7 or 11, the court may allow *reasonable compensation* under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, *not to exceed* 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims.

Bankruptcy Code, § 326(a) (emphasis added). The trustee's compensation is not a commission based on distributions and the maximum fee permitted is not the pre-

sumptive fee for the trustee. *In re Lan Assoc. XI, L.P.*, 192 F.3d 109, 115–16 (3rd Cir.1999); *In re Neill*, 242 B.R. 685, 689 (Bankr.D.N.D.1999); *In re Biskup*, 236 B.R. 332, 336 (Bankr.W.D.Pa.1999); *In re Moore*, 235 B.R. 414, 416 (Bankr.W.D.Ky. 1999). Rather, § 326(a) caps the trustee's compensation. The compensation awarded must be reasonable and it may not exceed the maximum amount computed under § 326(a).

In many chapter 7 cases, the trustee is ultimately paid the maximum fee permitted by § 326(a). That does not make § 326(a) the presumptive fee. It is simply a recognition that in the smaller cases trustees provide services that are of a value that is at least the amount capped by § 326(a). However, in larger cases, the same result does not follow with such regularity. In those cases, and the present case, the trustee must support his fee request in the same manner as any other professional. The appropriate standards are those set out in *Blum* and *Johnson*, modified for the unique responsibilities imposed upon a trustee. The trustee is an attorney, as are most other chapter 7 panel trustees. In these circumstances, the trustee's hourly rate should generally be the same as his attorney hourly rate provided that it does not exceed the prevailing market rate. There is no basis to either increase or decrease the trustee's hourly rate because he is performing trustee duties rather than attorney functions.[40] Here, the applicable prevailing market rate is $265 per hour.

The mere size of this case standing alone is no justification for an upward adjustment. The Supreme Court stated that where the "claimed rate and number of hours are reasonable, the re-sulting product is presumed to be the reasonable fee", *Blum*, 465 U.S. at 897, 104 S.Ct. at 1547. But, this is not to be mechanically applied. *Johnson*, 488 F.2d at 720 ("[W]e do not attempt to reduce the calculation of a reasonable fee to mathematical precision."); *King*, 88 B.R. at 770 ("The above guidelines, however, have not been applied in a mechanical fashion."). Adjustments-both upward and downward—are permissible. *Blum*, 465 U.S. at 897, 104 S.Ct. at 1548 ("The statute requires a 'reasonable fee,' and there may be circumstances in which the basic standard of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high."); *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 1940, 76 L.Ed.2d 40 (1983)("Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified."). Many upward (or downward) factors are ordinarily included in the fee calculation and should not be counted again. *Daly*, 790 F.2d at 1077. What must be avoided is "double counting" the same factors. *Daly*, 790 at 1077. If a factor is "subsumed within other factors used to calculate a reasonable fee, it normally should not provide an independent basis for increasing the fee award." *Blum*, 465 U.S. at 900, 104 S.Ct. at 1549–50. Here, the case is not dominated by unique or complex issues. There are no unusual or perplexing legal issues. There is more administrative work required than in the typical case, but that does not change the essential nature of this work. *In re J.W. Knapp Company*,

---

**40.** The trustee's accountants and his law firm also performed trustee duties and will be compensated at the same professional rates for both trustee duties and either accountant or legal duties.

930 F.2d at 388. The fact that there is more administrative work is accounted for in the fee calculation by the number of hours expended. It cannot itself provide a basis for an upward adjustment. To do so permits "double counting." *Blum*, 465 U.S. at 899, 104 S.Ct. at 1549.

■■■ The complexity of a case should also be considered. In this case, no adjustment is appropriate. Any complexity arose from the size of the estate and the magnitude of the undertaking. The trustee met this challenge by substantially delegating tasks. This delegation, in turn, required additional supervision and management which was accomplished in large part by frequent staff meetings, generally weekly. The meetings were attended by various individuals, generally attorneys from his law firm, members of Frank & Company and individuals hired by the trustee pursuant to his authority to operate the collections division and the records center. Many hours were consumed in these meetings at significant expense to the estate. These hours are not expended in a routine case and are peculiar to this case.[41] Those hours are included in the fee applications filed by the trustee, his law firm and the accounting firm. Thus, the complexity inherent in this case has been accounted for in the compensation of the professionals, including the trustee, by the additional hours billed to the estate. To also allow the same factor to also justify an increase in the hourly rate, or an upward adjustment of the

awarded fee would be double counting. Both the size of the estate and the concomitant complexity are fully accounted for in the compensation of the professionals by the additional hours expended to meet these challenges.

### B. Allocation of Services Between Trustee and Law Firm

■■■■■ In evaluating the trustee's fee application and the law firm's fee application, it is necessary to bear in mind the distinction between legal work for which counsel may be compensated and trustee work for which the trustee may be compensated. The long-standing rule is that counsel may not be compensated for performing the trustee's duties. *See* Part I.C., above; *In re Meade Land and Dev. Co.*, 527 F.2d 280 (3rd Cir.1975); *In re Union Dredging Co.*, 225 F. 188, 195–96 (D.Del.1915). In addition to the trustee's duties set out in Part I.C. above, a trustee should not engage counsel to act as an intermediary with other counsel employed by the trustee. *King*, 88 B.R. at 772. In a small case an interface is simply not necessary and interposes additional layers of management, all of which wish to be compensated. In large cases, a trustee may well need a more sophisticated team, but that team is the trustee's team, not counsel's team. The associated fees fall within the trustee's province and reflect his choices in administering the case. This does not mean that the trustee's law firm cannot communicate with various counsel or assist or co-ordinate their joint

---

**41.** Courts routinely scrutinize meetings and court hearings in which more than one attorney participates to assure that the additional attorneys are necessary. Generally, only one attorney's time is compensated. *In re Wiedau's, Inc.*, 78 B.R. 904, 908 (Bankr.S.D.Ill. 1987); *In re Wildman*, 72 B.R. 700, 710 (Bankr.N.D.Ill.1987). In this case, the trustee frequently appeared in court with several attorney's, each of whom made a short presen-

tation. While the time the multiple attorneys billed the estate would normally have been disallowed, it was allowed in this case because of the trustee's delegation of tasks. However, as the case proceeds, the need for multiple attorneys at hearings diminishes and it can be expected in the future that such attorney time will be disallowed as redundant and unnecessary.

or respective legal efforts—as opposed to merely acting as an intermediary between the outside law firms and the trustee. To the extent the law trustee's law firm was actually performing legal services rather than management services for the trustee, the fees will be allowed. After carefully reviewing the law firm's fee applications, $10,418.50 of the applications constitute services for managing litigation, acting as intermediary, or discharging other trustee duties. Much of this time relates to the lease litigation for which special counsel was retained. The time expended receiving communications from special counsel and generally discussing the case is allocable to the trustee. This is time that the trustee's law firm spent in functions where it was effectively acting as the client. Time expended by the trustee's law firm on legal research, particularly the maximum claim a landlord may be allowed under 11 U.S.C. § 502(b)(6), is legal in nature. It complemented but did not duplicate special counsel's efforts. Here the law firm was acting as counsel. This time is attorney time and fully compensable.

■ Typically, the law firm's fee application would be denied to the extent that it performed trustee duties. *See, e.g., King.* Here, it is clear that the trustee requested the services of his firm and that the estate benefitted from them. The same individuals appear on both the law firm's fee applications and the trustee's fee applications. Had the trustee included the time entries in question in his fee application, he would have been compensated for the services rendered. Consequently, subject to the following section on specific services, the amount that is disallowed from the law firm's fee application will be treated as a part of the trustee's application and awarded as a part of the trustee's fees, subject to

the limitation imposed by § 326(a) on the total trustee compensation.

### C. Specific Services

■ First Union National Bank was the estate's only secured creditor. Early in the proceeding the trustee and First Union settled their differences with respect to the payoff due to the bank. The trustee received a small discount in the settlement. The settlement was approved by the court and required payment within three business days after closing on the sale of a school. (Docket Entry 102). The trustee requested an extension of the deadline which First Union granted. However, the trustee failed to timely pay the claim within the extension period. Ultimately, First Union filed a motion seeking sanctions from the trustee personally and recovery of the full amount of its claim without deduction of the settlement credit. (Docket Entry 238). The court denied First Union's request to avoid the settlement credit but did allow interest on its claim from the day it should have been paid to the date of payment and assessed the interest as a sanction against the trustee personally. First Union was to be placed in the position it ought to have been in at no expense to the estate. The trustee noted an appeal from the sanction order but withdrew the appeal before briefs were filed in the district court. (Docket Entries 395 and 415). The law firm's fee application requests reimbursement of $105.00 from the estate to docket the appeal. The bank's motion was for sanctions against the trustee personally for failing to timely comply with the settlement order. The motion was successful. In these circumstances, the trustee's defense after an initial review of the pleadings should be at his own expense. The time reflected on the fee applications is reasonable and appropriate to determine the bankruptcy estate's responsibility in

this matter as opposed to the trustee's personal responsibility. The request for reimbursement of the $105.00 fee for the abandoned appeal will be disallowed.

 Certain expenses cannot be allowed. The law firm requested $17,728.25 for computer research.[42] There is no indication as to the topics researched and no way for the court to determine whether the expense was reasonable or necessary. The court requested further information about the expenses. In response, the trustee filed a three-page memorandum that rather than providing any factual information as to the reasonableness or necessity of the computer research expenditures, only argued that the trustee is not required to personally bear any costs of the administration of the case except office overhead. (Docket Entry 489).[43] The issue here, however, is even more basic: a professional must demonstrate that the expenses claimed are both reasonable and necessary. *See Milbank, Tweed & Hope v. McCue*, 111 F.2d 100 (4th Cir.1940) (decided under the Bankruptcy Act of 1898); *In re Ponce Marine Farm, Inc.*, 259 B.R. 484, 497 (D.Puerto Rico 2001). *See also* 3 Collier 330.05[1] and [2] (15th ed.2002). This has not been done. The trustee's seven-

attorney law firm has a significant bankruptcy practice. Today a subscription with a national bankruptcy publisher for bankruptcy cases on computer compact disc costs about $2,500 a year for a basic license. To the extent that research is necessary on bankruptcy issues, the cost of such subscriptions must be compared to the $17,541.00 expense for on-line research sought to be reimbursed. Here, the requested reimbursements far exceeds the cost of a basic subscription license. Whether the law firm has its own library or relies on the excellent local bar associations' libraries, all of which are readily available, legal research expenses must still be reasonable.[44] It is not reasonable for a multi-attorney law firm with a specialized bankruptcy practice to seek reimbursement of on-line computer research expenses that are more than seven times the cost of a basic compact disc subscription. This is not to suggest that no on-line legal research expenditures are reimbursable. Limited research in non-bankruptcy areas not covered by a typical bankruptcy service may well be appropriate and cost effective. However, they must be explained and substantiated like any other

**42.** The fees requested were $5,858.71 on the second fee application; $11,160.33 on the third fee application; $317.48 on the fourth fee application; $204.48 on the fifth fee application and $187.25 on the sixth application. In addition, $220.50 was requested for reimbursement of court reporter fees which will be considered below.

**43.** This misstates the question. The real question is what expenses are recoverable. Merely attaching the label "expense" to an expenditure does not make it reimbursable. A further question lurks in the shadows. A trustee is a fiduciary of the bankruptcy estate. Only the actual, out-of-pocket expenses may be reimbursed. A trustee may not profit at the expense of the estate by marking up expenses. This raises an interesting problem with paralegals. A law firm expects to earn a

profit from the utilization of paralegals. They are not generally billed as expenses but as fees. The paralegal's time is included in the firm's time records. A paralegal's hourly rate will include—the law firm hopes—a profit component. However, a trustee is compensated separately from the recovery of his out-of-pocket expenses. His compensation is capped by § 326, but his expenses are not. Consequently, a trustee has an incentive to bill a paralegal as an expense, not as a part of his fee application. But, expenses can only be billed at cost, without markup and without profit.

**44.** A law firm's print library is a traditional law firm overhead item. There is no immediately apparent reason why there should be a different treatment for a digital library.

expense or legal service. The nature of the issue researched needs to be disclosed just as the nature of a telephone conversation or the preparation of a letter or a pleading must be disclosed. *In re Gillett Holdings, Inc.*, 137 B.R. 462, 473 (Bankr. D.Colo.1992). The court, the United States Trustee and the creditors must have sufficient information so that they may make a determination that the research was both reasonable and necessary. *In re Central Pac. Boiler & Piping, Ltd.*, 88 B.R. 277 (Bankr.D.Hawai'i 1988). A lump sum that covers an entire month and does not indicate the topics or issues researched is insufficient. Here, not only is there a single monthly lump-sum amount, but the attorney's time records do not suggest areas of inquiry that would support a $17,541.00 on-line research expense. This is particularly significant in this case because the trustee employed special counsel to represent him in pension matters, education matters, and litigation matters. Significant research in these areas would be expected to have been conducted by special counsel, not the trustee's law firm. The request for reimbursement of on-line computer research will be denied.

■ Similarly, the requested reimbursement for court reporter fees of $220.50, apparently for copies of transcripts of court proceedings, must also be denied. There is no indication why the expenses were incurred and the court is unable to determine whether they were necessary. There may be good reason for such expenses, such as appeals. However, except for the trustee's appeal of the personal sanction, no appeal has been noted. The three fees are each small, indicating short hearings or partial transcripts. The trustee or a member of his law firm, many times both, was present at every hearing so there is no apparent need for a transcript of any hearing.

■ The trustee and his law firm incurred $31,297.00 for preparing and presenting fee applications for Frank & Company. They also incurred expenses with respect to preparing and presenting the fee applications of other special counsel and professionals. Traditionally, this court allows the trustee or his law firm to be compensated for preparing the fee applications for professionals the trustee employs. Typically, this includes auctioneers, real estate brokers, non-bankruptcy counsel and other professionals. The fees have always been modest and assist all involved. Non-bankruptcy professionals are rarely experienced in preparing or presenting fee applications and the trustee or his law firm can produce routine fee applications quickly and efficiently. The estate is benefitted principally by avoiding the inevitable responses to inarticulate fee applications which, if properly presented, are generally routinely approved. In addition, the trustee has an independent duty to review fee applications to determine whether they are appropriate. In this case, though, Frank & Company regularly participates in bankruptcy cases for this trustee and cannot be characterized as a novice. It should know the fee application process and be able to substantially prepare acceptable fee applications without significant assistance from the trustee. While this case is larger than most and warrants additional efforts by the trustee in assisting professionals prepare fee applications, the amount of time and effort expended on the Frank & Company fee applications is simply excessive.

James M. Lewis of Holland & Knight entered an appearance on behalf of Frank & Company on January 14, 2002 (Docket Entry 560). His first time entry was on December 8, 2001. He was responsible for prosecuting the accountant's fee application at least from January 14, 2002, forward. Once separate counsel for the ac-

countant made his appearance, the trustee and his law firm's involvement should have been substantially curtailed. The trustee had reviewed the fee application and had stated his support for it. The burden was on the applicant, the accounting firm, to obtain approval of the application. The trustee's and the law firm's work is compensable, to the extent necessary to review fee applications and assist—modestly—in their preparation. Taking into account the work done, the work product, the complexity of the work and the appearance of the accountant's separate counsel, the appropriate amount is $5,000.00 for the trustee's law firm.

 Similar issues arise with the trustee's application as his law firm's application. The trustee requests $15,564.00 for preparing and prosecuting his own fee applications [45] and $2,090.50 in connection with fee applications of other professionals, not including Frank & Company. Additional fees were requested by the law firm. The treatment of these fees should be substantially the same as the treatment of the accountant's requests for fees incurred in preparing and defending its fee applications. In considering this portion of the fee application, it should be noted that the trustee's paralegals and members of his firm expended time on the preparation of his supplemental memorandum concerning reimbursement of expenses which missed the point concerning the basis for the on-line research charges and expended time on researching the basis for the trustee's compensation, an issue on which the trustee is well acquainted and which is more in the nature of work benefitting the trustee personally than the bankruptcy estate. In this case, a reasonable fee is $7,500 for preparing the trustee's fee applications, reasonably assisting other professionals in preparing their fee applications and in reviewing other professional's fee applications.

### D. Trustee's Fourth Fee Application

The trustee's fourth application for interim trustee's fees requests $48,609.78, the maximum allowable under § 326(a) as of the date of the application.[46] The time records submitted with the application reflect $89,478.50 in time expended. The trustee computed his requested fee by simply determining the maximum fee permitted under 11 U.S.C. § 326(a). This is incorrect. A trustee's fee must initially be computed as any other professional's fee. Only if that fee exceeds the limitation imposed by § 326(a) will the fee will be reduced to comply with § 326(a). The trustee has consistently applied this incorrect standard. In the second and third applications, the fee the trustee computed overstated the fee to which he was entitled. However, on the fourth application for interim compensation, the fee requested is lower than the fee to which he is entitled. Particularly when reviewing interim trustee's fees, it is important to determine the trustee's actual fee earned through the fee application period. The amount of compensable work is not necessarily related to actual distributions at any particular point during the administration of the case. Sometimes a little effort can result in significant distributions. At other times significant efforts may be necessary before even a small distribution can be made. If the allowed fee exceeds the § 326(a) limi-

---

**45.** The time records reflect of this, the trustee himself expended 25.5 hours or $7,522.50. Most of the time was denoted as preparing for and attending the hearings on the fee applications.

**46.** The trustee disbursed $9,199,461.39 through the date of the application and has $24,197,723.92 on hand for future disbursements.

tation, payment will be limited to amount allowable under § 326(a); however, as further distributions are made, payment of the earned but unpaid portion of the fee can be authorized.

In this case, the court has computed the trustee's interim fees based on the time expended as required by *Blum* and § 330(a) of the Bankruptcy Code, subject only to the maximum allowable under § 326(a). The same must be done with respect to the fourth application. The court will determine the total amount of the trustee's compensation through the date of the application but will limit payment at this time to the maximum allowable under § 326(a).

The fee application will be reduced in three regards. First, the application contains time expended in connection with the Frank & Company fee applications. This issue was considered as a whole earlier in this opinion and the time included on the fourth application was considered and taken into account in determining the amount of fees to be awarded with respect to that matter. Having considered this time and incorporated it into the trustee's other applications under consideration, to allow it again would be to double count it.

■ Second, a paralegal researched conflict matters. The total charge was $897.00. The time records do not fully describe the research, however, it occurred at the time the trustee and his firm were discussing a merger with Wiley, Rein &

Fielding. It appears that this work was related to the proposed merger. A trustee has a continuing duty to monitor conflicts and should not charge the estate for the discharge of this duty.

The third matter concerns the requested hourly rates. The hourly rates requested are substantially higher than requested on prior applications.[47] The trustee's new proposed rate increased from a previously requested $295 an hour to $375. A relatively new associate's hourly rate is proposed to be increased from $165 to $210. A paralegal's hourly rate is proposed to be increased from $95 to $130. All other hourly rates also proposed to be increased. None of the proposed increases were disclosed in the notice of the fee application mailed to the creditors and it is doubtful if any knew of the proposed increase. The proposed increases are not discussed in the fee application. The new hourly rates appear only at the end of the time records. The old rates are not shown and there is no mention of an increase in the hourly rates.

■ Changes in rates must be conspicuously disclosed in the notice of the fee application sent to creditors and clearly identified and discussed in the fee application itself. Without a reference in the notice of the fee application or a discussion in the fee application itself, the court cannot be sure if the change in hourly rates is a silent request to increase hourly rates or is simply a clerical mistake.[48] Absent a

---

**47.** The proposed increases range from 27% to 46% and average 36%.

**48.** Adding to the confusion are the rates in the law firm's sixth fee application (which covers the period from January 1, 2002, through April 29, 2002) and the trustee's fourth application (which covers the period from January 1, 2002, through April 26, 2002). The same timekeepers are in both applications. All attorney's rates are substan-

tially increased in the trustee's fourth application, but only one is changed in the law firm's sixth fee application. Consequently, the same attorneys are billed at different rates on the law firm's sixth fee application and the trustee's fourth fee application for services performed during the same time period.

The one exception is the attorney whose hourly rate is changed in the law firm's fifth and sixth fee applications from the law firm's prior applications. The rate is increased

conspicuous disclosure, it is unlikely that creditors will be aware of the change particularly since few receive the entire fee application. Without a prominent discussion in the fee application itself, the change may easily be overlooked.[49]

■ In any event, the actual hourly rates requested by the trustee are not determinative. The issue remains the prevailing market hourly rates. As discussed above, the maximum prevailing market rate is $265 an hour. The trustee offered no evidence of a change in the prevailing hourly rate and the court's review reveals none. The mere passage of time is not itself sufficient to justify a change in an attorney's hourly rate and does not necessarily indicate a change in the prevailing market hourly rates. The fees requested will be re-computed at the rates previously applied.

### III. Summary of Allowed Fees

The interim fee applications of Frank & Company; Gold, Morrison & Laughlin, P.C.; and H. Jason Gold, Trustee, after adjustment for hourly rates and in the case of the accountant, minimum billing units, will be allowed as follows:

| Applicant | Professional Fees | Trustee Fees | Total Fees | Expenses |
|---|---|---|---|---|
| Frank & Company | $326,056.96 | $ 40,723.69 | $366,780.65 | $13,278.94 |
| Gold, Morrison & Laughlin, P.C. | $228,756.50 | $ 25,873.00 | $254,629.50 | $33,322.03 |
| H. Jason Gold, Trustee | | | | |
| Second Application | | $ 59,500.00 | | |
| Third Application | | $ 48,362.50 | | |
| Fourth Application | | $ 59,972.00 | $167,834.50 | |
| Total | $554,813.46 | $234,431.19 | $789,244.65 | $46,600.97 |

The fees denoted as "Trustee Fees" are those fees, as discussed above, that would otherwise be disallowed as professional fees because they are trustee duties and were outside the scope of the professionals' employment. In the circumstances of this case, the professionals will be paid these fees, but the fees will be charged against the trustee's maximum compensation allowable under § 326(a). But for this charge against the trustee's maximum compensation, they would be disallowed.

### IV. Application of the Cap on the Trustee's Compensation

#### A. The Present Applications

The total disbursements through April 26, 2002, the period through which the fee applications run, were $9,199,461.36. The maximum trustee compensation allowed by § 326(a) is $299,233.84, which is less than the allowed trustee's fees and the fees attributable to the trustee for the accountant and the trustee's law firm. *See* Part III, above.[50] Fees will be allowed to the

from $185.00 in the first four applications to $225.00 in the fifth and sixth application. However, in the trustee's fourth fee application (which covers the same period as the law firm's sixth application), the attorney's rate is $270.00.

49. The United States Trustee reviewed the fee application and made no comment about the increased rate. It is not known if he recognized the proposed increase.

50. The trustee was previously awarded $134,441.39. The trustee's compensation and the compensation allowed to the trustee's law

parties on a pro rata basis.[51] As further funds are distributed, the maximum compensation will increase and additional amounts of the fees allowed may be released, subject to the concerns raised by the trustee's resignation. At present, payment of fees subject to the limitation imposed by § 326(a) is limited to 71.48% of the allowed fees.

## B. Future Applications

■■■ The trustee's seven-attorney law firm merged into Wiley Rein & Fielding, LLP, a 225–attorney law firm effective April 29, 2002. As a part of the trustee's continuing duty to evaluate conflicts and the due diligence conducted as a part of the merger, the trustee determined that the merger created a conflict that required him to resign as trustee. The trustee resigned effective July 15, 2002. The trustee has been allowed interim compensation as trustee and additional compensation will be allowed at this time. It cannot be determined at this time what additional trustee fees may be incurred to complete this case. If the trustee's fees for the trustee and his successor are less than the maximum allowable by § 326(a), each trustee will be fully compensated. However, a problem may arise if the total trustees' fees exceed the allowable maximum. If the trustee had continued to serve as trustee to the completion of this case and the total fees exceeded the maximum allowable by § 326(a), only he would have been affected. With the appointment of a successor trustee, the successor trustee's fees may be affected by the cap on trustee fees. In these circumstances, the fees awarded today are provisional only and may be adjusted at the conclusion of the case. 11 U.S.C. § 330(a)(5). This includes those fees payable to Frank & Company and Gold, Morrison & Laughlin, P.C. that are attributable to the trustee and are included in the calculation of the maximum allowable fees under § 326(a). All fees paid are interim fees under 11 U.S.C. § 331 and are subject to disgorgement. 11 U.S.C. § 330(a)(5).

## V. Conclusion

The interim fee applications of the accountant, the trustee's law firm and the trustee will be provisionally allowed as set forth above.

■■■■

---

firm and the accountant charged against the trustee's maximum compensation is a total of $418,097.37. The total trustee's compensation is $242,303.89; the trustee's law firm is $16,444.00; and the accountant's is $89,948.48.

51. The order approving the Frank & Company's and the trustee's first fee applications reserved for a future date the allocation of Frank & Company's fees to the trustee's duties. That allocation has been completed as a part of the review of the present applications. As stated above, Frank & Company's first fee application will be reduced to $191,949.85 to reflect the application of the proper hourly rates for the services rendered. That amount is allocated $142,725.06 for professional services and $49,224.79 for trustee duties. This allocation is included in the determination of the maximum amount that may be paid at this time.